NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

HUDSON RIVER AGGREGATES,
INC., Respondent.

No. 327, Docket 80–4114.

United States Court of Appeals,
Second Circuit.

Argued Oct. 31, 1980.
Decided Jan. 14, 1981.

Susan L. Dolin, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., of counsel), for petitioner.

Frederick D. Braid, Rains & Pogrebin, Mineola, N. Y., for respondent.

Before FRIENDLY and OAKES, Circuit Judges, and OWEN, District Judge.[*]

OAKES, Circuit Judge:

This case, having as its principal issue whether an employer was properly treated as a successor, is here on a petition by the National Labor Relations Board for enforcement of its order issued against Hudson River Aggregates, Inc. (HRA), on October 22, 1979. The Board, substantially adopting the recommended order of the Administrative Law Judge, directed HRA to cease and desist from certain unfair labor practices and to take affirmative steps to remedy its statutory violations. We grant the petition for enforcement.

## FACTS

In early 1978 HRA bought two stone quarries, one each in Haverstraw and Tomkins Cove, New York, including the equipment and stockpiles, from Martin Marietta Aggregates, Inc. The contract of sale was executed on January 19, 1978, and the sale was closed effective March 1, 1978. HRA continued to operate the quarries in essentially the same manner as its predecessor had, with the exception of reactivating stone production at the Tomkins Cove quarry, which Martin Marietta had been using

since 1975 simply for the sale of stockpiled stone. Because some of the equipment was in disrepair when Martin Marietta sold to HRA, production at the Haverstraw quarry did not begin until April 17, 1978.

For a period of at least thirty years, undisturbed by changes in the ownership of the two quarries, three separate units had represented the quarry employees. The truck drivers were represented by Local 445, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America; many of the other quarry employees were represented by Local 825, International Union of Operating Engineers, AFL–CIO. The third bargaining unit at the quarries, Laborers Local 60, is not a party to this litigation.[1] When Martin Marietta terminated production and sold the quarries to HRA, it had collective bargaining agreements with each of these three unions. Out of a total of 57 Martin Marietta employees, 33 were Engineers Local 825 members, 8 were Teamsters Local 445 members, and 16 were represented by Laborers Local 60. Jay Boyle, president of HRA, was provided with copies of the collective bargaining agreements prior to the closing.

HRA promised jobs to five of the drivers who had been employed by Martin Marietta. Nevertheless, when the business representative for Teamsters Local 445 called Boyle in late February and in early March to discuss representation of the drivers, Boyle said that he was not at that time prepared to discuss the matter and did not know whether he would ever be ready to do so.[2] Boyle said that his plans were not formalized and that the quarries might not open for a year. However, Boyle soon hired

[*] Of the Southern District of New York, sitting by designation.

1. On May 1, 1978, Laborers Local 60 petitioned the Board for an election. Action on that petition has been delayed pending the outcome of this unfair labor practices litigation.

2. HRA argues that testimony by the business representative for Teamsters Local 445, William Comiez, is illogical, is contradicted by Boyle's testimony, and is not worthy of belief.

However, the Administrative Law Judge found that Comiez's testimony was not substantially contradicted by Boyle, and credited Comiez. Of course, a determination of credibility by an administrative law judge who has heard the witnesses' testimony is entitled to great weight and will be overturned only when the evidence to the contrary is very strong. *NLRB v. Bausch & Lomb, Inc.*, 526 F.2d 817, 822 (2d Cir. 1975).

as plant superintendent the same person who had previously worked as superintendent for Martin Marietta and had a thirty-three-year history of employment at the Haverstraw and Tomkins Cove quarries. And between March 13 and March 17 Boyle hired four rank and file employees, none of whom had previously worked at the quarries. The president of Teamsters Local 854, an industrial union which at that time did not represent any employees of quarrying operations, notified Boyle on March 17 that the union had obtained authorization cards from these four employees and sought representative status. With only four employees on the payroll, Boyle immediately recognized Teamsters Local 854 as representative of all his employees and, after almost two weeks of contract negotiation during which no additional employees were hired, executed a three-year collective bargaining agreement with the union on March 28, effective April 1. The agreement contained a union security clause requiring all HRA employees to be members of Teamsters Local 854.

Almost immediately after execution of this agreement, HRA began hiring in earnest. The supervisory personnel remained essentially unchanged: of the four foremen hired, three had previously held supervisory positions and one had been a mechanic with Martin Marietta. On April 3 the company also hired 29 rank and file employees, 27 of whom were former Martin Marietta employees—18 members of Engineers Local 825 and 9 members of Laborers Local 60. One of the foremen advised these employees that they would lose their jobs if they did not sign Teamsters Local 854 authorization cards.[3]

On April 10, however, Engineers Local 825 informed Boyle that it in fact represented a majority of HRA's employees and asked the company to bargain. Boyle refused, saying that HRA employees were already represented by Teamsters Local 854. Also on April 10 the company hired one additional employee, who had not previously worked for Martin Marietta. And on April 17 the company hired 9 more men, 2 of whom were former Martin Marietta employees represented by Engineers Local 825, and 7 of whom had not worked for Martin Marietta. Thus, by the time production began at the Haverstraw quarry on April 17, HRA had hired a total of 43 employees, 29 of whom were former Martin Marietta employees—20 members of Engineers Local 825 and 9 members of Laborers Local 60. By November of 1978, HRA's work force had grown to 92 employees.

The five former drivers for Martin Marietta, to whom HRA had promised jobs, were not called in for work when production began on April 17. Instead, their jobs were filled by five new employees, hired that day, who had not previously worked at the quarries. Therefore, on April 17 Teamsters Local 445 filed charges against HRA with the Board, alleging unlawful discrimination against the five former Martin Marietta drivers and refusal to bargain. Teamsters Local 445 picketed HRA, and was subsequently joined by Engineers Local 825, which also filed unfair labor practice charges against HRA. The picketing ended six weeks later, and the company hired the five drivers.

The Board found that HRA had violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), by refusing to hire the five drivers, for the purpose of avoiding recognition and bargaining with Teamsters Local 445. Accordingly, the Board ordered HRA to make whole these employees for loss of pay suffered because of this discrimination. The Board further found that HRA had violated sections 8(a)(1), (2), and (3) of the Act, 29 U.S.C. §§ 158(a)(1)–(3), by prematurely recognizing Teamsters Local 854, and sections 8(a)(1) and (2), 29 U.S.C. §§ 158(a)(1)–(2), by threatening employees if they did not sign Teamsters Local 854 authorization cards. The Board ordered the company to

---

3. Again, HRA argues on appeal that the foreman denied the allegations. But the Administrative Law Judge credited the testimony of three of the employees over that of the foreman, and we accept this determination by the examiner who heard the testimony.

withdraw recognition from Teamsters Local 854 and to reimburse employees for fees and dues withheld from their pay pursuant to the union security clause. Finally, the Board found that HRA had violated sections 8(a)(1) and (5), 29 U.S.C. §§ 158(a)(1), (5), by refusing to bargain with Engineers Local 825 and Teamsters Local 445, and ordered the company to recognize these unions as exclusive bargaining representatives of their respective units.

## DISCUSSION

█ The Board properly found HRA to be a successor employer to Martin Marietta and therefore required to recognize and bargain with Engineers Local 825 and Teamsters Local 445. Section 8(a)(5) of the National Labor Relations Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Under the successorship doctrine, when a new employer takes over a business, but the employees' bargaining unit remains appropriate, the successor employer must recognize and bargain with the incumbent union. *See NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 281, 92 S.Ct. 1571, 1579, 32 L.Ed.2d 61 (1972). Relevant factors in determining whether a new employer is a successor, for purposes of bargaining obligations, include whether the new employer is using the same supervisory personnel, equipment, and facilities as its predecessor, whether it is producing the same goods, and whether there is a substantial identity in the work force before and after the change in ownership. *See Service, Hospital, Nursing Home and Public Employees Local 47 v. Cleveland Tower Hotel, Inc.*, 606 F.2d 684, 687 (6th Cir. 1979); *IUEW v. NLRB*, 604 F.2d 689, 694 (D.C.Cir.1979); *NLRB v. Middleboro Fire Apparatus, Inc.*, 590 F.2d 4, 6–8 (1st Cir. 1978). Successorship inquiries are very much related to the specific factual situation, *Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees & Bartenders International Union*, 417 U.S. 249, 256, 94 S.Ct. 2236, 2240, 41 L.Ed.2d 46 (1974); *Burns*, 406 U.S. at 274,

92 S.Ct. at 1575, and continuity in the identity of the work force is one of the most important considerations, *see Howard Johnson*, 417 U.S. at 263–64, 94 S.Ct. at 2243–44; *Cleveland Tower*, 606 F.2d at 687; *Nazareth Regional High School v. NLRB*, 549 F.2d 873, 879 (2d Cir. 1977).

█ The Board in the instant case found that HRA is carrying on essentially the same business as its predecessor Martin Marietta did. HRA is performing the same quarrying operations on the same premises, using former Martin Marietta supervisors and equipment, and with employees performing essentially the same tasks as they did when the quarries were owned by Martin Marietta. Admittedly, HRA purchased a new stone crusher and planned to reactivate stone production at the Tomkins Cove quarry, where production had been halted in 1975, but a change in the scope of a business by a new employer does not, in itself, affect a successorship determination, *see IUEW v. NLRB*, 604 F.2d at 694; *Middleboro Fire Apparatus*, 590 F.2d at 8; *Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131, 1141 (7th Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974). Rather, "[t]he essential inquiry is whether operations, as they impinge on union members, remain essentially the same after the transfer of ownership." *IUEW v. NLRB*, 604 F.2d at 694. The Board's finding that HRA's contemplated expansion of its production capacity did not alter the nature or structure of the enterprise is supported by substantial evidence and therefore will not be set aside. *See* 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488–91, 71 S.Ct. 456, 464–46, 95 L.Ed. 456 (1951); *NLRB v. Bausch & Lomb, Inc.*, 526 F.2d 817, 822 (2d Cir. 1975).

█ Once it is established that HRA is continuing its predecessor's operations essentially unchanged, then the primary consideration becomes whether a majority of HRA's employees were formerly employed by Martin Marietta. This determination turns on which date is selected for examining the composition of HRA's work force.

The Board chose April 17 as the appropriate date, for that was when normal production at the Haverstraw quarry began, with a representative complement of 43 employees, which is comparable to the number employed by Martin Marietta when it sold the quarries to HRA. Indeed, the usual date selected for determining the bargaining obligations of a successor employer is the time of transfer of the business, when full operations begin. *NLRB v. Ideal Laundry Corp.*, 422 F.2d 801, 804 (10th Cir. 1970) (per curiam); *see Bellingham Frozen Foods, Inc. v. NLRB*, 626 F.2d 674 (9th Cir. 1980) (successor employer's duty to bargain commences once it is clear that he intends to hire a majority of his work force from the ranks of his predecessor's employees), *petition for cert. filed*, 49 U.S.L.W. 3373 (U.S. Nov. 6, 1980) (No. 80–735); *cf. Lammert Industries v. NLRB*, 578 F.2d 1223, 1226 & n.5 (7th Cir. 1978) (employer must bargain with union when employees represented by the union are transferred to a new plant, even though the employer plans expansion and more employees subsequently are hired; "appropriate point of analysis is ordinarily the date the new facility opened and began full operations").

■ HRA argues, however, that its bargaining obligations should not have been determined until it reached its "full complement" of employees, more than six months later, in November 1978. It is true that the Supreme Court in *Burns* noted that in some situations

> it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit.

406 U.S. at 295, 92 S.Ct. at 1586. But we do not believe that an employer may always delay its bargaining obligations until it has expanded its business to the proportions contemplated when it purchased the enterprise. Although HRA contends that it did not hire a "full complement" of employees until November 1978, we have found no

decision postponing determination of a successor employer's bargaining obligation for so long an interval following the commencement of its operations. *Cf. Pacific Hide & Fur Depot, Inc. v. NLRB*, 553 F.2d 609, 614 (9th Cir. 1977) (emphasizing that time at which successor employer held to have hired "full complement" was less than sixty days after it commenced operations). In this case, where HRA was not rebuilding a collapsed operation, but rather starting up the business essentially as it was when sold by Martin Marietta—though concededly HRA had plans for expansion—we think that the Board properly found that the 43 employees at work on April 17 were a representative complement of HRA's work force.

Certainly, the point at which a successor employer has hired a sufficient complement of workers for determining the employer's bargaining obligations will vary from case to case. In *NLRB v. Pre-Engineered Building Products, Inc.*, 603 F.2d 134 (10th Cir. 1979), where the successor employer took over a collapsed business and had to rebuild both production demand and work force, the court held that bargaining obligations should not have been determined when the employer had hired only four employees. Because the predecessor employer had employed as many as 41 employees, the successor, according to the court, should have been allowed to hire more employees before its bargaining obligations were set. Indeed, in that case, the successor had not taken over an enterprise in full operation, but rather was trying to rebuild a defunct business. *See also Pacific Hide*, 553 F.2d 609 ("full complement" can be determined only by considering the facts in each case; held that employee complement of 10 was not sufficiently representative, but that employee complement of 19—just one more than the predecessor's work force—which was reached a short time after the successor began its operations, was representative).

■ HRA took over an on-going business, continuing its operations essentially unchanged. The Board, in an effort to balance the objective of selection of a bargaining representative by the maximum

number of employees with the objective of employee representation as early as possible, see *Pre-Engineered Building Products*, 603 F.2d at 136, decided that the April 17 start-up date was controlling. We agree that April 17 was an appropriate date to use for determining HRA's bargaining obligations. On that date, of the 43 employees, 20 were formerly members of Engineers Local 825, 9 were formerly members of Laborers Local 60, and 14 were, as far as the record shows, unaffiliated.[4] Since 5 of the 43 employees were truck drivers, the Board was justified in concluding that the 20 workers who were previously members of Engineers Local 825 constituted a majority of the persons employed as operating engineers on April 17. As a successor employer, HRA should have recognized and bargained with that union.

■■■ HRA has challenged the appropriateness of the three bargaining units at the quarries, asserting that a single, plant-wide unit is proper. However, the Board found the historic units to be appropriate, and this conclusion is supported by evidence in the record. The Board is given broad discretion to determine appropriate bargaining units, 29 U.S.C. § 159(b), and that determination will not be disturbed unless found to be arbitrary, see *South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 805–06, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (per curiam); *IUEW v. NLRB*, 604 F.2d at 695–96; *Wheeler-Van Label Co. v. NLRB*, 408 F.2d 613, 616 (2d Cir.), *cert. denied*, 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1969). The bargaining unit approved by the Board need not be the *most* appropriate unit, only *an* appropriate unit. *MPC Restaurant*

*Corp. v. NLRB*, 481 F.2d 75, 78 (2d Cir. 1973). And a successor employer's duty to bargain does not depend on prior Board election and certification of the incumbent union. Bargaining obligations are the same whether the union is certified by the Board or voluntarily recognized by the employer. See 29 U.S.C. §§ 158(a)(5), 159(a); *IUEW v. NLRB*, 604 F.2d at 695; *NLRB v. Movie Star, Inc.*, 361 F.2d 346, 351 (5th Cir. 1966).

■■■ As for the five former Martin Marietta drivers, assured of jobs with HRA but then allegedly discriminated against because of their membership in Teamsters Local 445, we uphold the Board's finding of violations of sections 8(a)(1) and (3), 29 U.S.C. §§ 158(a)(1), (3); see *Howard Johnson*, 417 U.S. at 262, n.8, 94 S.Ct. at 2243 n.8; *Bausch & Lomb*, 526 F.2d at 821–22, as supported by substantial evidence in the record. Had these five drivers been on the job on April 17, the date selected for determining HRA's bargaining obligations, Teamsters Local 445 would have represented a majority of the employees in its unit, since there was no evidence that HRA intended to utilize more than 6 hauling units, and therefore HRA also violated sections 8(a)(1) and (5), 29 U.S.C. §§ 158(a)(1), (5), by refusing to recognize and bargain with Teamsters Local 445.[5]

■■■ Though HRA's position seems to be that its bargaining obligations should not have been determined until November 1978, it rather inconsistently asserts that it was proper for it to recognize and bargain with Teamsters Local 854 in March 1978, with only four employees on the payroll and before production had even begun. We affirm the Board's determination that prema-

---

4. Of these 14 employees, none of whom had worked for Martin Marietta, 5 were truck drivers, hired in place of the 5 Teamsters Local 445 drivers who had been promised jobs with HRA.

5. Of the 92 employees on the job in November 1978, 58 had not worked for Martin Marietta, though there is no evidence in the record as to what jobs these employees perform and therefore it is unclear into which of the three bargaining units each of these employees fit. Since the operations at the quarries are essentially unchanged, however, and the three un-

ions have represented their respective bargaining units at these quarries for more than 30 years, it should not be difficult for HRA and the unions to determine which employees are members of which bargaining units. If they cannot do so, either the employer or the unions may file a unit clarification petition with the Board. While this might seem at first glance to be putting the cart before the horse, the problem was brought about by the employer's own conduct.

ture recognition of Teamsters Local 854—that is, before HRA had hired a representative complement of employees—violated sections 8(a)(1), (2), and (3) of the Act, 29 U.S.C. §§ 158(a)(1)–(3). *See NLRB v. Forest City/Dillon-Tecon Pacific*, 522 F.2d 1107, 1108 (9th Cir. 1975). We also agree with the Board that HRA's threats to enforce the union security clause, contained in an agreement executed by a union which was not a legitimate representative of the employees, violated sections 8(a)(1) and (2), 29 U.S.C. §§ 158(a)(1)–(2).

Because the findings of the Board are supported by substantial evidence, we grant the Board's petition for enforcement of its order.