**PREMIUM FOODS, INCORPORATED, Petitioner and Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent and Cross-Petitioner.**

Nos. 82-7176, 82-7267.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 9, 1982.

Decided July 1, 1983.

Thomas Bassett, Lukins, Annis, Shine, McKay, Van Marter & Rein, Spokane, Wash., for petitioner and cross-respondent.

John Saperstein, N.L.R.B., Washington, D.C., for respondent and cross-petitioner.

Before CHOY and FLETCHER, Circuit Judges, and MacBRIDE,* District Judge.

---

\* The Honorable Thomas J. MacBride, Senior United States District Judge for the Eastern District of California, sitting by designation.

1. Retail customers are outlets such as grocery stores, while food service customers include hotels, restaurants, and institutions.

MacBRIDE, District Judge:

Premium Foods, Inc. (Premium) petitions for review of an order of the National Labor Relations Board (Board), reported at 260 N.L.R.B. No. 92 (1982). The Board ordered Premium to recognize and bargain with United Food & Commercial Workers Local Union No. 1439 (Union). The Board cross-petitions for enforcement of its order. We enforce the Board's order.

## FACTS

Swift and Company, a large multi-national corporation with numerous facilities throughout the United States, maintained a plant in Spokane, Washington for many years. The Spokane facility purveyed meat and meat products, cheese, fish, shortening and oils to approximately 230 customers in parts of Washington, Montana, and Idaho. Typically, forty percent of its volume was in retail sales and sixty percent in the food service area.[1] Swift closed the Spokane facility on August 1, 1980.

Prior to the closure of the Spokane plant, Swift had entered into a collective bargaining agreement with the Union. The bargaining unit was made up of production and maintenance employees, including truckdrivers, at the Spokane plant. During normal operating times, approximately twelve or thirteen employees made up the unit. Prior to closure, the loss of a catering account resulted in a reduction of approximately four employees. At the time that Swift ceased operations, it employed nine employees in five separate job classifications covered by the collective bargaining agreement.[2]

Swift's sales unit manager for the Spokane plant was Robert Racicot, a Swift employee since 1964. He had formerly been a Union member, but had taken a withdrawal card from the Union when he became a superintendent in 1974. On June

---

2. These classifications included butcher, truckdriver, order packer, utility, and machine operator.

30, 1980, at a meeting of Swift employees, Racicot read a letter from Swift announcing that the plant would close on August 1. He then told the workers that he would attempt to organize a new operation to replace Swift. In July, Racicot sent a letter to Swift customers seeking their patronage for the new business.

During the last two weeks of Swift's operation, three Swift employees informed Racicot that they were seeking withdrawal cards from the Union, and in mid-August, a fourth employee told him that he had sought a withdrawal card.

Premium was formed as a new corporation, with Racicot as president. It sold meat, cheese, and related products, with a strong emphasis on food service items. Although Premium purchased nothing from Swift,[3] it used the same building as Swift, retained the same telephone number, and rented the same in-plant machinery that Swift had used. Premium served the same general geographical area as Swift, although it discontinued operations in Montana. Of Swift's 230 customers, approximately 122 gave their patronage to Premium.

Premium began operations on August 4, 1980, with five operating employees, all former Swift employees, in classifications which had been represented in the Swift operating unit. A sixth former Swift employee, Jerry Anderson, the butcher and gang leader, assisted Racicot in supervising the operation in addition to performing production duties.[4] By August 26, despite some turnover, the operating unit had expanded to eight rank-and-file employees, five of whom had been employed by Swift, plus Anderson. The unit remained at this size until January, 1981, when Premium added one full-time and two part-time employees, none of whom had been employed by Swift. Premium had by that time introduced a new food service item.

On August 26, 1980, the Union sent a letter to Roger Purkett, secretary of Premium, and co-owner and manager of Becwar Packing Company, a Spokane meat company. Incorrectly believing that Becwar had purchased the old Swift plant, the Union asked Becwar to bargain. By a letter of September 10, 1980, Purkett responded that Becwar did not own the business operating in the old Swift plant. He stated that the new company, which he did not identify, was not a successor employer to Swift with an obligation to bargain because 1) the management had a good faith doubt that the Union represented a majority of employees, and 2) the new operation had not yet hired a full complement of workers. On September 18, the Union sent a letter to Premium, which replied by referring to Purkett's letter of September 10. No collective bargaining took place.

On October 2, 1980, the Union filed charges with the Board, alleging that Premium had refused to bargain with the certified bargaining representative. The matter was heard by an Administrative Law Judge (ALJ) who found that Premium was a successor to Swift, that Premium had reached a representative complement of workers by the date that the Union requested bargaining, and that Premium did not have an adequate basis for a good faith doubt as to the Union's majority status. The ALJ concluded that Premium violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5) (1976), by refusing to recognize and bargain with the Union. The Board affirmed the findings and conclusions of the ALJ.

## DISCUSSION

### A. *Standard of Review*

An order of the Board must be enforced if the Board's factual findings are sup-

---

**3.** The Board did not rely on the ALJ's erroneous finding that Premium purchased Swift's inventory.

**4.** The Administrative Law Judge and the Board found that Anderson, who was a union member while employed by Swift, was a low-level supervisor under Premium. As such, he would not have been a proper member of the bargaining unit represented by the Union, which excluded supervisors.

ported by substantial evidence on the record as a whole, and the Board has correctly applied the law to those facts. *Westwood Import Co. v. NLRB,* 681 F.2d 664, 666 (9th Cir.1982); *NLRB v. World Evangelism, Inc.,* 656 F.2d 1349, 1352 (9th Cir.1981).

### B. *The Successor Employer Issue*

■■■ A new employer who conducts essentially the same business as the former employer, and who hires former employees of his predecessor as a majority of his work force is considered a successor employer. *Westwood Import Co.,* 681 F.2d at 667; *Kallmann v. NLRB,* 640 F.2d 1094, 1100 (9th Cir.1981). Where a union has been recognized or certified as the representative of the employees of the predecessor, and the successor hires a majority of his workers from those employees, a presumption arises that the successor's employees also support the union.[5] *Westwood Import Co.,* 681 F.2d at 668; *Pacific Hide & Fur Depot, Inc. v. NLRB,* 553 F.2d 609, 611 (9th Cir.1977). The basic rationale is that a mere change in ownership, without an essential change in working conditions, would not be likely to change *employee* attitudes toward representation. *See NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 278–79, 92 S.Ct. 1571, 1577, 32 L.Ed.2d 61 (1972); *NLRB v. Band-Age, Inc.,* 534 F.2d 1 (1st Cir.1976), *cert. denied,* 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976).

■■■ Premium contends that the scope and nature of its business differs fundamentally from that of Swift. It points out that only sixty percent of the business at Swift's Spokane plant was to food service customers, whereas ninety-eight percent of Premium's sales were in the food service area. There is no evidence, however, that this change in emphasis caused any essential change in the employees' working conditions. Former Swift employees working

for Premium did essentially the same jobs following the change in employer. Although Premium introduced a new product line, the employees used the same skills and tools as before. *See NLRB v. Middleboro Fire Apparatus, Inc.,* 590 F.2d 4, 7–8 (1st Cir.1978); *NLRB v. Band-Age, Inc.,* 534 F.2d at 6.

Premium points out that Swift was a large multi-national corporation, and that management decisions emanated from the Chicago office, whereas Premium was a small, locally owned and managed company. Such a change does not prevent the new employer from being a successor where the nature of the employing industry is basically unchanged. *See Zim's Foodliner, Inc. v. NLRB,* 495 F.2d, 1131, 1142 (7th Cir.) (change in employer from national grocery chain to individual supermarket unlikely to significantly affect employee attitudes), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974). The Swift bargaining unit had been composed of workers at the Spokane plant only; the change in employers did not affect the size or definition of the unit. Although upper-level management changed, Racicot and Anderson provided some carry-over in supervisory personnel.

Premium's employees performed essentially the same work, in the same plant, with the same equipment as before, under supervisors who were known to them. Thus, substantial evidence supports the finding that there was no essential change in the business that would have affected employee attitudes towards representation.

### C. *The Full Complement Issue*

Premium argues, however, that it is not a successor employer with a duty to bargain because at the time the Union demanded

---

**5.** In determining whether a successor employer has a duty to bargain, the relevant test is not whether a majority of its employees were actually members of the union while employed by the predecessor, as Premium appears to contend, but whether a majority of the successor's employees were *represented by* the union. *See*

*NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 278, 92 S.Ct. 1571, 1577, 32 L.Ed.2d 61 (1972); *Westwood Import Co. v. NLRB,* 681 F.2d 664, 668 (9th Cir.1982); *NLRB v. Edjo, Inc.,* 631 F.2d 604, 606–07 (9th Cir. 1980).

bargaining Premium had not yet hired its full complement of employees.

█ The "full complement" standard has its origin in dictum in *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). The Supreme Court stated that in some situations, "it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit ...." *Id.* at 295, 92 S.Ct. at 1568. Where a new employer has hired some former employees represented by the union, and some new employees not so represented, the employer's duty to bargain depends on whether a majority of the employees in the unit wish to be represented by the union. *See* 29 U.S.C. § 159(a) (1976) (section 9(a) of the Act). The right of the majority is paramount. *Pacific Hide & Fur Depot,* 553 F.2d at 612.

█ The "full complement" standard attempts to define *when* the makeup of the controlling majority is to be determined. *Id.* The count need not be delayed until the employer has completed the hiring of all employees in the bargaining unit. The determination of whether a "full complement" exists involves striking a balance between the objective of allowing the maximum number of employees a voice in selecting their bargaining representative and the goal of assuring that the employees have representation as quickly as possible. *NLRB v. Pre-Engineered Bldg. Products, Inc.,* 603 F.2d 134, 136 (10th Cir.1979).

In non-successor cases involving the original election of a bargaining representative for an expanding unit, the Board has required a substantial complement, representative of the skills and types of employees who will ultimately constitute the unit. *See St. John of God Hospital, Inc.,* 260 N.L.R.B. No. 117 (1982); *Clement-Blythe Companies,* 182 N.L.R.B. 502 (1970), *enf'd,* 77 L.R.R.M. 2373 (4th Cir.1971). The "substantial and representative" standard embodies the balance between early representation and maximum participation that lies at the heart of the "full complement" concept.[6] *See NLRB v. Pre-Engineered Bldg. Products, Inc.,* 603 F.2d at 136 and n. 1. It is thus appropriate to apply the "substantial and representative" standard in successor employer cases such as this.[7]

In determining whether a substantial and representative complement was present on a given date, the Board considers whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production. *Hayes Coal Co.,* 197 N.L.R.B. 1162, 1163 (1972). The Board also takes into account the size of the complement on that date and the time expected to elapse before a substantially larger complement would be at work, *Clement-Blythe Companies,* 182 N.L.R.B. at 502, as well as the relative certainty of the employer's expected expansion, *see St. John of God Hospital, Inc.,* 260 N.L.R.B. No. 117 (1982).

█ If a substantial increase in the size of the employee complement is expected with reasonable certainty in a relatively short time, a delay in counting the majority is appropriate. In *Pacific Hide & Fur Depot, Inc.,* 553 F.2d at 610, 611, the employer reached a full complement in less than sixty

---

**6.** *See Clement-Blythe Companies,* 182 N.L.R.B. 502 (1970), *enf'd,* 77 L.R.R.M. 2373 (4th Cir. 1971):

The Board must often balance what are sometimes conflicting *desiderata,* the insurance of maximum employee participation in the selection of a bargaining agent, and permitting employees who wish to be represented as immediate representation as possible. Thus, it would unduly frustrate existing employees' choice to delay selection of a bar-

gaining representative for months or years until the very last employee is on board. Conversely, it would be pointless to hold an election for very few employees when in a relatively short period the employee complement is expected to multiply many times.

**7.** *See NLRB v. Hudson River Aggregates,* 639 F.2d 865, 870 (2nd Cir.1981) ("full complement" and "representative complement" used interchangeably).

days. During that time the complement expanded steadily as planned, from seven at the beginning of operations to nineteen, just one more than the complement of the predecessor when it ceased operations. Thus, the delay was short, and the increase in the number of workers to be represented was significant. In *St. John of God Hospital,* 260 N.L.R.B. No. 117 (1982), the Board allowed the employer four to five months to reach a representative complement in its registered nurse unit, where the employer expected a five-fold increase in the number of registered nurses in that time. The Board found that the employer's plans for expansion were not speculative, for while the hospital employed only four registered nurses at the time of the administrative hearing, it had provided in its budget for twenty-nine, had made some hiring commitments, and had embarked in a recruiting campaign expected to result in the hiring of seventeen to twenty registered nurses within five months.

In the case of a successor employer, the condition of the predecessor and the size of its complement are relevant considerations. Where a successor takes over a business which has essentially collapsed, so that the successor must rebuild both production demand and work force, it may take some time to achieve a full complement. *NLRB v. Pre-Engineered Bldg. Products, Inc.,* 603 F.2d 134, 136 (10th Cir.1979) (predecessor moribund; successor had only four employees, predecessor as many as forty-one). On the other hand, where the successor takes over from a business in full operation, even if the successor has plans for expansion, a representative complement is usually present on the date the new employer begins production. *See NLRB v. Hudson River Aggregates, Inc.,* 639 F.2d 865, 870 (2nd Cir.1981) (predecessor healthy; successor's complement comparable to number employed by predecessor when it sold the business).

■ Here, the ALJ found that Premium did not employ a full complement of workers when it began operations on August 4 or in the days immediately following. He found, however, that a representative complement was achieved by August 26, the date that the Union requested bargaining.

Premium contends that the company was not able to operate profitably with only nine employees, including Anderson, and notes that the complement for Swift in normal times was twelve to thirteen. Premium argues that Swift was "moribund" and that more than three weeks were required to rebuild business. Racicot had plans for expansion, and expected Premium to take up to two years to reach full profitable production, with an ultimate complement of eighteen. Nonetheless, Premium suggests that an appropriate date for determining the status of a majority of its workers would be January 26, 1981, when the workforce, including Anderson, reached twelve.[8]

Premium began operations with five rank-and-file employees, plus Anderson. During the first three weeks of operation, several new workers were hired; others resigned or were fired. By August 26 the workforce had stabilized at eight rank-and-file employees, plus Anderson. On that date, all of Swift's job classifications were substantially filled. Premium was able to continue operations with this complement for the next five months, until the introduction of a new product required hiring additional workers.

While Premium did not take over "an on-going business, continuing its operations essentially unchanged," as was the case in *Hudson River Aggregates,* neither was

---

**8.** Although Premium now asks the court to find that a representative complement was not present until January 26, 1981, Racicot testified at the administrative hearing that when the unfair labor charges were filed in October, 1980, he indicated his willingness to hold an election, and told his employees that they should decide whether they wanted the Union to represent them. This indicates that Racicot thought that an adequate complement was present in October. The employees working for Premium in October were the very same employees who were in the bargaining unit on August 26, the date the Union demanded recognition.

Swift "moribund" as was the predecessor in *Pre-Engineered Bldg. Products.* Swift served 230 customers at the time it closed, approximately half of whom continued to patronize Premium. There was no significant hiatus in production. Swift closed on Friday, August 1, and Premium started up on Monday, August 4. The complement on August 26 was the same size as Swift's complement when it closed,[9] and differed by only three or four workers from Swift's unit in ordinary times.[10]

While Premium's president planned to expand operations, an employer cannot always "delay its bargaining obligations until it has expanded its business to the proportions contemplated when it purchased the enterprise." *Hudson River Aggregates,* 639 F.2d at 870. The time expected to reach the planned expanded production was two years, too great a time to delay employee representation.[11] On August 26, plans for future hiring were uncertain, since additional hiring would depend on increased sales. On that date, Premium was not engaged in immediate recruiting or hiring as were the employers in *Pacific Hide* and *St. John of God Hospital.* The number of employees in the unit remained constant for the next five months, and nothing in the record indicates that the one full-time and two part-time workers added in January, 1981, brought new or different skills to the unit which would render the previous complement unrepresentative.

There is thus substantial evidence in the record as a whole to support the finding of the ALJ and the Board that on August 26 Premium employed a substantial and representative complement. Since five of the eight rank-and-file employees in the bargaining unit on that date were former Swift employees, such workers formed a majority of Premium's workforce, and Premium had a duty to bargain with the Union.

### D. *The Reasonable Good Faith Doubt Issue*

Premium argues that it properly refused to bargain because it had a good faith doubt that the Union represented a majority of the employees in the bargaining unit.

Once a union has been certified or recognized, it enjoys a presumption of continued majority status. *NLRB v. Edjo, Inc.,* 631 F.2d 604, 606–07 (9th Cir.1980). This presumption is irrebuttable for a reasonable time, usually one year, and is rebuttable thereafter. *Id.; Pioneer Inn Associates v. NLRB,* 578 F.2d 835, 838 (9th Cir. 1978). A successor employer may rebut the presumption and refuse to bargain with the previously-recognized union only if he can show that the union in fact no longer represents a majority of the members of the bargaining unit, or that he has a reasonable good faith doubt of majority support. *NLRB v. Edjo, Inc.,* 631 F.2d at 607; *NLRB v. World Evangelism, Inc.,* 656 F.2d 1349, 1354 (9th Cir.1981).

A good faith doubt must be reasonable and supported by objective consid-

---

**9.** *See Pacific Hide & Fur Depot, Inc. v. NLRB,* 553 F.2d 609, 614 (9th Cir.1977) (successor's full complement just one more than predecessor's complement when it closed).

**10.** *Compare NLRB v. Pre-Engineered Bldg. Products, Inc.,* 603 F.2d 134 (10th Cir.1979) (successor's complement only ten percent of predecessor's maximum complement) *with NLRB v. Hudson River Aggregates,* 639 F.2d 865 (2nd Cir.1981) (successor's complement comparable to predecessor's).

**11.** The ALJ, whose decision was adopted by the Board, expressed the necessary balancing as follows:

[I]n a circumstance, as here, wherein the employing industry remains the same, and the collective-bargaining unit appropriate by reason of the carryover from the predecessor employer to the new employer of the same job classifications and similar job functions, the bargaining rights and the interest of the former unit members now employed by the new employer, newly hired employees and the new employer are best accommodated and balanced by determining the majority status of the union as of the date the new employer began full-scale operations with a representative complement, even though the hoped for expansion of clientele, revenue and operating personnel had not been fully achieved.

erations.[12] *NLRB v. Silver Spur Casino,* 623 F.2d 571, 579 (9th Cir.1980), *cert. denied,* 451 U.S. 906, 101 S.Ct. 1973, 68 L.Ed.2d 294 (1981); *NLRB v. Cornell of California, Inc.,* 577 F.2d 513, 515–16 (9th Cir.1978). In this circuit, "the evidence presented to establish reasonable good faith doubt, individually or cumulatively, must unequivocally indicate that union support had declined to a minority." *Silver Spur Casino,* 623 F.2d at 579, *quoted in N.T. Enloe Memorial Hospital v. NLRB,* 682 F.2d 790, 794 (9th Cir.1982).[13] Evidence which raises only an ambiguous inference of loss of majority support is not sufficient. *Enloe Memorial Hospital,* 682 F.2d at 795. No single equivocal factor is enough to raise a reasonable doubt. *See NLRB v. Tahoe Nugget, Inc.,* 584 F.2d 293, 305 (9th Cir. 1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979).

As the objective basis of a good faith doubt, Premium relies on the knowledge of its president, Racicot, that at least four members of the Union had requested withdrawal cards. Based on his own experience when he obtained a withdrawal card upon becoming a superintendent, Racicot concluded that the request for withdrawal cards meant that the employees no longer wished to be represented by the Union.

The fact that four employees asked for withdrawal cards is, at best, equivocal. As the Board points out, a request for a withdrawal card might merely indicate that the employee did not wish to pay Union dues at a time when future employment was uncertain. Even if a request for withdrawal indicated that the employee no longer

wished to be a member of the Union, it does not necessarily indicate that he no longer wished to be represented by it. Majority support requires only that a majority of the unit desires representation by the union. *N.T. Enloe Memorial Hospital v. NLRB,* 682 F.2d at 795. Union support does not require union membership. *Sahara-Tahoe Corporation v. NLRB,* 581 F.2d 767, 772 (9th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2837, 61 L.Ed.2d 284 (1979). *See NLRB v. Vegas Vic, Inc.,* 546 F.2d 828, 829 (9th Cir. 1976), *cert. denied,* 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1977); *Terrell Machine Company v. NLRB,* 427 F.2d 1088, 1090 (4th Cir.), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970).

The evidence presented by Premium does not unequivocally indicate that a majority of employees no longer wished representation by the Union. The Board's decision that Premium failed to provide an adequate objective basis for a reasonable good faith doubt is supported by substantial evidence.

## CONCLUSION

The Board's findings in this case are supported by substantial evidence, and its conclusion that Premium violated 29 U.S.C. § 158(a)(1) and (5) by refusing to recognize and bargain with the Union follows from those findings.

ORDER ENFORCED.

**12.** The test for a good faith doubt is an objective one. A doubt must be reasonably based on objective evidence regardless of the employer's subjective belief. *NLRB v. Tahoe Nugget, Inc.,* 584 F.2d 293, 299–301 & n. 25 (9th Cir.1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979). In the absence of a decertification petition by the employees themselves, the preferred course for an employer with doubts about the union's majority is to petition for a new election. *Id.* at 302. *See Zim's Foodliner, Inc. v. NLRB,* 495 F.2d 1131, 1139 (7th Cir.), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974).

**13.** *Compare NLRB v. Tahoe Nugget, Inc.,* 584 F.2d 293, 304–08 (9th Cir.1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979) (employee discontent, turnover, union inactivity, low union membership, financial difficulties of the union, and bargaining history were insufficient individually and cumulatively, where none of the evidence was wholly referable to a decline in union support) *with Dalewood Rehabilitation Hospital, Inc. v. NLRB,* 566 F.2d 77, 80 (9th Cir.1977) (although individual factors might have been insufficient, cumulatively they provided an adequate basis for reasonable doubt).