# NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## CUTTER DODGE, INC., Respondent.

Nos. 86–7304, 86–7392.

United States Court of Appeals,
Ninth Circuit.

Argued April 7, 1987.

Submitted June 1, 1987 [1].

Decided Aug. 21, 1987.

---

**1.** On March 13, 1987 the panel ordered submission of this case deferred pending decision of the Supreme Court in *NLRB v. Fall River Dyeing & Finishing Corp.*, —— U.S. ——, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). We also indicated that the parties would be given an opportunity to comment, following oral argument, upon the effect, if any, of *Fall River* on the case before this court. *Fall River* was decided on June 1, 1987. In our view, the case does not alter the law applicable to the present appeal. Comment from the parties is therefore unnecessary. We order this case submitted as of June 1, 1987, the date of the Supreme Court's decision in *Fall River*.

Gary Y. Shigemura, Randall Y.C. Ching, Honolulu, Hawaii, for petitioner.

W. Christian Schumann, Washington, D.C., for respondent.

Before POOLE, NORRIS and BRUNETTI, Circuit Judges.

POOLE, Circuit Judge:

The National Labor Relations Board (Board) petitions this court for enforcement of an order which found that Cutter Dodge, Inc. (Cutter Dodge), as the successor of Pearl City Chrysler-Plymouth-Dodge, Ltd. (Pearl City), had engaged in unfair labor practices by refusing to recognize and bargain with the union which had represented Pearl City's employees. Cutter Dodge petitions for review of the same order. Because there was substantial evidence to support the Board's conclusion and because the Board did not abuse its discretion in ordering Cutter Dodge to post a remedial notice or in denying Cutter Dodge's motion for leave to adduce additional evidence, we enforce the Board's order and deny Cutter Dodge's petition for review.

*FACTS*

In April 1977, the International Longshoremen's and Warehousemen's Union Local 142 (Union), pursuant to an election, was certified by the National Labor Relations Board as the representative of a bargaining unit comprised of the parts, service and new car prep [2] employees at Pearl City Chrysler-Plymouth-Dodge, Ltd., in Pearl City, Hawaii. Following this election, Pearl City and the Union entered into a collective bargaining agreement which was effective until January 31, 1982.

On January 12, 1982, Pearl City and Cutter Dodge, Inc. signed a buy-sell agreement pursuant to which Cutter Dodge purchased Pearl City's inventory of Dodge cars and parts. Cutter Dodge also assumed the lease obligations for a significant portion of the real property used by Pearl City and was granted a franchise to sell Dodge cars by the Chrysler Corporation. On January 29th, Pearl City closed its doors. Cutter Dodge then hired the managers and nine of the former employees from Pearl City's parts and service department and commenced business operations at the former Pearl City premises on February 3, 1982. Because Cutter Dodge's inventory at this time consisted solely of cars purchased from Pearl City which had already been prepared for sale, it had no immediate need for a new car prep department and so hired none of Pearl City's new car prep employees.

On February 5, 1982, the Union sent a letter to Cutter Dodge requesting recognition as the bargaining representative for the parts and service department employees. Despite the fact that a majority of the employees in the department (nine of sixteen) were former Pearl City employees, Cutter Dodge did not respond to this request. The general manager and the business manager testified that they did not believe that Cutter Dodge was obligated to recognize the Union because Cutter Dodge had not been a party to the collective bargaining agreement and because the agreement had expired before Cutter began operations. The Union filed unfair labor charges with the Board on March 31st, alleging that Cutter Dodge violated sections 8(a)(5) and (1) of the National Labor

---

2. New car prep employees perform the final preparations required before a dealership can deliver a new car to a customer, for example, waxing and polishing the body, applying the undercoating, and checking the engine.

Relations (Act), 29 U.S.C. §§ 158(a)(5) and (1).

Between March 30th and the last week of April, Cutter Dodge purchased approximately thirty-five new cars on which the prep operations were performed by independent contractors or by Cutter Ford, a related enterprise. In the last week of April, the dealership hired three new employees and established a new car prep department. It hired a fourth employee to work in this department in June 1982. None of the new employees had previously been employed by Pearl City. As a result, a majority of the production and maintenance personnel (eleven of twenty) employed by Cutter Dodge as of June had not previously worked for Pearl City.

On July 8, 1982, Cutter Dodge eliminated its new car prep department and contracted with Chrysler to have all new car prep work done by a Chrysler subsidiary on the mainland. Cutter laid off the four prep work employees, and, as a consequence, the majority of employees in the unit was once again composed of former Pearl City employees. This majority status continued until approximately two weeks before the hearing on the unfair labor charges when Cutter Dodge laid off two former Pearl City employees.

The hearing was held before an Administrative Law Judge (ALJ) on November 4, 1982 to determine whether Cutter was a successor to Pearl City because it employed a "full complement" of workers in the unit at the time of the Union's request for recognition. In a decision issued on December 28, the ALJ concluded that at the time it received the Union's request, Cutter Dodge had employed all the unit employees it intended to hire in the foreseeable future. The ALJ therefore ruled that Cutter Dodge was Pearl City's successor and had violated sections 8(a)(1) and (5) of the Act by refusing to recognize and bargain with the Union. The ALJ proposed an order requiring Cutter to recognize the Union, to bargain with the Union upon request, and to post a notice stating that any agreement reached with the Union regarding terms of employment of the unit employees would be put into writing and signed. The Board affirmed the ALJ's decision and adopted the proposed order on February 14, 1986.

On April 1, 1986, Cutter Dodge became one of five subsidiary corporations, all car dealerships, owned by a parent company called CUMANCO. Claiming that under this new corporate relationship its employees became part of a centralized employee unit, Cutter Dodge filed a motion for leave to adduce additional evidence. This motion was denied by the Board on June 20, 1986. The Board now applies to this court for enforcement of its order (case no. 86–7304) and Cutter Dodge petitions for review of the same order (case no. 86–7392).

## DISCUSSION

### A. Successorship

■ The new owner of a business is a successor for collective-bargaining purposes if it conducts essentially the same business as the former employer and if, at the time the new employer has hired its "full complement" of employees, a majority of the employees consists of individuals previously employed by the former employer. *NLRB v. Jeffries Lithograph Co.,* 752 F.2d 459, 463–64 (9th Cir.1985); *Premium Foods, Inc. v. NLRB,* 709 F.2d 623, 627 (9th Cir.1983); *Westwood Import Co. v. NLRB,* 681 F.2d 664, 667 (9th Cir.1982). It is undisputed that Cutter Dodge conducts essentially the same business as Pearl City. Thus, the only issue related to successorship before the court is whether Cutter Dodge had hired a "full complement" of employees by February 5, 1982, the date of the Union's letter requesting recognition.

The "full complement" requirement was first articulated in *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). The Supreme Court noted that "it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit...." *Id.* at 295, 92 S.Ct. at 1586. Reasoning that the determination whether a "full complement" exists involves balancing the

goals of ensuring employees early representation and allowing the maximum number of employees to participate in choosing a bargaining representative, the Board and many courts, including this circuit, treat a "substantial and representative complement" as the equivalent of a "full complement". *See, e.g., Indianapolis Mack Sales & Service, Inc.,* 272 NLRB 690, 694–96 (1984), *enf. denied on other grounds,* 802 F.2d 280 (7th Cir.1986); *NLRB v. Aircraft Magnesium,* 265 NLRB 1344, 1245 (1982), *enf'd,* 730 F.2d 767 (9th Cir.1984); *Premium Foods,* 709 F.2d at 628; *NLRB v. Hudson River Aggregates, Inc.,* 639 F.2d 865, 870–71 (2d Cir.1981). This approach has recently received the explicit endorsement of the Supreme Court. *Fall River Dyeing & Finishing Corp. v. NLRB,* — U.S. —, 107 S.Ct. 2225, 2240–41, 96 L.Ed.2d 22 (1987), *aff'g NLRB v. Fall River Dyeing & Finishing Corp.,* 775 F.2d 425 (1st Cir. 1985).

In its Decision and Order of February 14, 1986, the Board found that as of February 5, 1982, when the Union requested recognition, Cutter Dodge already employed a substantial and representative complement of workers, a majority of whom had previously been employed by Pearl City. Cutter Dodge argues that it did not have a substantial and representative complement of workers until it activated its new car prep department in late April of 1982.

The Board's determination of successorship must be upheld if the Board's factual findings are supported by substantial evidence on the record as a whole and the Board has correctly applied the law to these facts. *Jeffries,* 752 F.2d at 462; *Premium Foods,* 709 F.2d at 626–27. *See also Fall River,* 107 S.Ct. at 2235.

■ As we have noted in the past, there is no simple mathematical formula by which the Board can determine whether a particular employer has hired a substantial and representative complement of employees. *Jeffries,* 752 F.2d at 464. Instead, the Board must look at the totality of the circumstances and avoid giving controlling weight to any one factor. *Id.* In making this determination the Board considers at least five factors: (1) whether the job classifications designated for the operation are substantially filled, (2) whether the new business is at a substantially normal level of operations, (3) the difference between the current size of the complement and its size at the time the business reaches a normal level of operations, (4) the time expected to elapse before a substantially larger complement will be at work, and (5) the relative certainty of the employer's anticipated expansion of the complement. *Fall River,* 107 S.Ct. at 2239, *citing Premium Foods,* 709 F.2d at 628. *See also Jeffries,* 752 F.2d at 464. As we discuss below, all but one of these factors are either supportive of the Board's conclusion or neutral.

1. *Substantially Filled Job Classifications.* The only factor which arguably supports Cutter Dodge's contention that it had not achieved a substantial and representative complement by February 5, 1982 is that it had not filled all the job classifications in the bargaining unit. As the dealer correctly points out, no new car prep employees had been hired as of February 5; yet this was a job classification historically included in the unit since its certification in 1977. However, given that Cutter Dodge postponed hiring in this classification for three months, and permanently abolished the classification two months later, this factor alone does not justify denying enforcement of the Board's order.

2. *Substantially Normal Level of Operations.* Cutter Dodge also argues that it had not reached a substantially normal level of operations at the time the Union requested recognition, noting that at that date its volume of sales was approximately only half the average reached in the months after March. This, however, is not a situation where a new employer took over a business which had collapsed. *Cf. NLRB v. Pre-Engineered Bldg. Products, Inc.,* 603 F.2d 134, 136 (10th Cir.1979). Rather, Cutter Dodge took over a business in full operation, a situation in which the Board usually finds that a representative complement exists on the date the new employer begins operation. *Premium Foods,* 709

F.2d at 629; *Hudson River*, 639 F.2d at 870. In addition, the Board correctly noted that in the past this court has held that when a new employer was serving even half the volume of customers as was its predecessor, it could be held to be operating at a substantially normal level for the purpose of determining successorship. *Premium Foods*, 709 F.2d at 630. Thus, this factor weighs in favor of the Board.

3. *Size of Complement at Time of Normal Production.* By February 5, 1982, Cutter Dodge had hired roughly eighty-five percent (sixteen of nineteen) of the unit employees that it ultimately hired by the time it established its new car prep department. The Board has been upheld in finding that significantly smaller percentages constitute substantial and representational complements. *Fall River*, 107 S.Ct. at 2240 (fifty percent); *Jeffries*, 752 F.2d at 467 (forty five percent). The Board finds additional support for its conclusion in the fact that when the Union sought recognition, Cutter had hired exactly the same number of unit employees as Pearl City had employed before shutting down. *See Premium Foods*, 709 F.2d at 630 (new employer had hired workforce of same size as predecessor); *Pacific Hide & Fur Depot, Inc. v. NLRB*, 553 F.2d 609, 614 (9th Cir.1977) (new employer had hired work force one employee larger than predecessor). Accordingly, this factor, too, supports the Board.

4. *Time Expected to Elapse.* Cutter Dodge claims that the nearly three-month hiatus between February 5 and the establishment of its new car prep department in late April was not an unreasonable period to delay its employees' right to representation. Courts have found delays of seven to eight months unreasonable, *Jeffries*, 752 F.2d at 467, *Hudson River Aggregates*, 639 F.2d at 870, while upholding a delay of two months. *Pacific Hide & Fur*, 553 F.2d at 614. Although the delay in the present case falls closer to the delay approved in *Pacific Hide & Fur*, we do not find under the circumstances of this case that a delay of three months was required. The Supreme Court has recognized that the interest of employees in being represented as

early as possible "is especially heightened in a situation where many of the successor's employees, who were formerly represented by a union, find themselves after the employer transition in essentially the same enterprise, but without their bargaining representative." *Fall River*, 107 S.Ct. at 2239. In addition, we note that one of the new car prep employees worked less than one month while the other three worked little more than two months. Under such circumstances, the countervailing objective of maximizing participation is clearly weakened.

5. *Certainty of Expansion.* Perhaps the single strongest factor supporting the Board's conclusion that a substantial and representative complement had been hired by February 5, 1982 is the demonstrated uncertainty of Cutter's plan to open its own new car prep department. The ALJ found that the dealership's "decision to even utilize a new car preparation department was clearly a tentative one from the outset," and despite Cutter's arguments to the contrary, the facts support the ALJ. Pearl City had a fully operational new car prep department complete with five employees until the dealership closed. Cutter Dodge could have, but did not, preserve the new car prep department when it reopened. As a result, during the first three months of its operations, Cutter had the prep work on its thirty-five cars done by independent contractors and by a related dealership rather than doing it in-house. More importantly, even when it did establish an in-house prep department, Cutter kept it in operation for only two months, permanently abolishing it on July 8, 1982. All Cutter's new car prep work has since been performed by a Chrysler subsidiary on the mainland.

Given these circumstances, the Board's determination that Cutter Dodge's plans to establish a new car prep department were not sufficiently certain to justify a three month delay of its employees' right to representation is tenable. As the uncontested facts indicate, former Pearl City employees did not constitute a majority in the bargaining unit for only a two month period during the first nine and one half months of Cutter's operation. To permit Cutter Dodge to

defer its employees' right to Union representation for three months while it contemplated doing its prep work in-house would upset the balance which the Board must strike between the goals of early representation and maximum participation.

In summary, while one of the five factors arguably supports Cutter Dodge, the others tilt sharply toward the Board. We therefore conclude that substantial evidence supports the Board's conclusion that Cutter Dodge had hired a substantial and representative complement of its workforce as of February 5, 1982.

### B. Remedial Notice

A remedial order of the Board should not be disturbed on review unless it is shown to be a patent attempt to achieve ends other than those which fairly effectuate the policies of the Act. *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943); *NLRB v. Warehousemen's Union Local 17*, 451 F.2d 1240, 1242–1243 (9th Cir.1971).

■ Under section 10(c) of the Act, 29 U.S.C. § 160(c), when the Board finds that a violation of the Act has been committed, it shall order the party in violation to cease and desist and take such affirmative action as will effectuate the policies of the Act. This authority granted to the Board is "broad," *NLRB v. Strong*, 393 U.S. 357, 359, 89 S.Ct. 541, 543, 21 L.Ed.2d 546 (1969), and includes the power to require that the offending party post a remedial notice that conveys to the employees a guarantee that their rights under the Act will be respected in the future. *NLRB v. Falk Corp.*, 308 U.S. 453, 462, 60 S.Ct. 307, 312, 84 L.Ed. 396 (1940). The Board ordered Cutter Dodge to post a remedial notice informing its employees that it would bargain with the Union about terms of employment and that it would put any agreement in writing and sign it.[3]

The dealer contends that the order would require Cutter to execute a binding con-

tract every time it agreed with the Union about any term or condition of employment, thereby putting Cutter "at a distinct disadvantage in the collective bargaining process." We disagree. Section 8(d) of the Act, 29 U.S.C. § 158(d), requires execution of a written contract "incorporating any agreement reached if requested by either party." *NLRB v. H. Koch and Sons*, 578 F.2d 1287, 1290 (9th Cir.1978). Employers can be required to execute partial agreements as well, provided that the parties have fairly contemplated that a binding contract could come into being despite the existence of unresolved issues. *NLRB v. Beckham, Inc.*, 564 F.2d 190, 194–95 (5th Cir.1977); *Railway Express, Inc. v. General Teamsters, Chauffeurs and Helpers Union*, 330 F.2d 859, 864 (3d Cir.1964). While the language of the Board's remedial notice does not clearly explain the extent of Cutter Dodge's duty to execute a written agreement, we think it fair to construe the order as requiring a written and signed memorial where the parties have contemplated that a binding contract can exist as to the agreed terms. So read, the remedial notice merely articulates a duty Cutter Dodge already has under the Act. It does not disadvantage Cutter Dodge or interfere with the purposes of the Act in any respect.

### C. Motion For Leave to Adduce New Evidence

■ The Board has considerable discretion in the grant or denial of a motion to reopen the record. *NLRB v. Fort Vancouver Plywood Co.*, 604 F.2d 596, 601 (9th Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980). The Board's decision on such a motion will not be set aside unless shown to constitute an abuse of discretion. *NLRB v. R & H Masonry Supply, Inc.*, 627 F.2d 1013, 1014 (9th Cir.1980).

Section 102.48(d)(1) of the Board's Rules and Regulations, codified at 29 C.F.R.

---

3. The relevant portion of the remedial notice reads as follows:

WE WILL, if we are asked to do so by [the Union], recognize and bargain with it as your union about your rates of pay, wages, work-ing hours, and other matters connected with your work. If we come to an agreement about any of these things with [the Union], WE WILL put that agreement in writing and sign it.

§ 102.48(d)(1), provides that a party seeking to reopen the record must file a motion stating the additional evidence sought to be adduced, the reasons why it was not previously produced, and why, if adduced and credited, the new evidence would require a different result from that previously reached. Cutter's motion alleged that Cutter's integration into a corporate structure comprised of a parent company and four other dealerships had rendered the previously certified bargaining unit inappropriate for the purposes of collective bargaining. Cutter Dodge acknowledges that the integration was not effected until April 1, 1986, approximately three and a half years after the hearing before the ALJ. The Board denied this motion.

The Board argues that it need reopen the record only if the additional evidence to be adduced is "newly discovered evidence"—that is, evidence which was in existence at the time of the hearing before the Board but which the party excusably failed to present at that time. Ample Ninth Circuit precedent supports the Board's position. *L'Eggs Products, Inc. v. NLRB,* 619 F.2d 1337, 1352–1353 (9th Cir.1980); *NLRB v. Pacific Southwest Airlines,* 550 F.2d 1148, 1153 (9th Cir.1977); *NLRB v. L.B. Foster Co.,* 418 F.2d 1, 4–5 (9th Cir.1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970). As the court in *L.B. Foster* noted, any other approach would put a premium on protracted litigation by encouraging employers to delay compliance in the hope that new and favorable circumstances would develop. *L.B. Foster,* 418 F.2d at 4.

Cutter Dodge's response only strengthens the Board's argument. Cutter Dodge relies on *NLRB v. Jacob E. Decker and Sons,* 569 F.2d 357, 363–64 (5th Cir.1978), in which the Fifth Circuit held that the Board did not abuse its discretion when it declined to reopen the record to receive evidence which was not in existence at the time of the Board hearing. The question is not whether the Board is forbidden to reopen the record to adduce such evidence, but whether the Board abuses its discretion if it refuses to open the record in such a situation. Under settled case law, the answer is clearly no.

The Board also correctly notes that it need not reopen the record unless the moving party has demonstrated that the new evidence would require a different result. *NLRB v. Johnson's Industrial Caterers, Inc.,* 478 F.2d 1208, 1209 (6th Cir.1973). In light of the presumption that a single outlet constitutes an appropriate unit, *Alaska Statebank v. NLRB,* 653 F.2d 1285, 1287 (9th Cir.1981), and that the Board is required to order bargaining only in an appropriate unit, not the most appropriate unit, *id.,* it cannot be said that the Board abused its discretion in refusing to reopen the record. If Cutter Dodge believes the present bargaining unit to be no longer appropriate, its proper remedy is to petition for modification of that unit pursuant to the procedures set out at 29 C.F.R. § 102.-61.

CONCLUSION

Substantial evidence supports the Board's conclusion that Cutter Dodge had hired a substantial and representative complement of employees by February 5, 1982. The Board did not abuse its discretion in ordering the dealership to post the remedial notice or in denying Cutter's motion to adduce additional evidence. Accordingly, the Board's order is enforced and Cutter Dodge's petition for review is denied.