NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

JEFFRIES LITHOGRAPH COMPANY,
a subsidiary of Ticor Printing Group,
Inc., Respondent.

No. 83–7100.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 9, 1984.

Decided Jan. 25, 1985.

Linda Weisel, Washington, D.C., for petitioner.

Alan V. Friedman, Munger, Tolles & Rickershauser, Los Angeles, Cal., for respondent.

Before PREGERSON and NORRIS, Circuit Judges, and SOLOMON,* Senior District Judge.

* Honorable Gus J. Solomon, United States District Court for the District of Oregon, sitting by designation.

**PREGERSON, Circuit Judge:**

The only question before us is whether substantial evidence supports the National Labor Relations Board's finding that Jeffries Lithograph Co. is the successor employer to Biltmore Press, Inc. After reviewing the record as a whole, we conclude that substantial evidence supports this finding. Therefore, we enforce the Board's order, which finds Jeffries guilty of committing unfair labor practices for failing to bargain with Local 262 of the Graphic Arts International Union (the union).

## FACTS

Biltmore Press was a small printing operation located in Carson, California. Biltmore employed about 20 production employees who answered to a single foreman. The two owners, Arthur and Robert Sollima, handled all other managerial and administrative matters.

The union represented the production employees under a collective bargaining agreement that expired on April 30, 1981. The agreement contained no successorship clause, but represented the latest product of a bargaining relationship that had lasted 20 years.

### A. *The Company Decides to Expand*

During 1980, Ticor Printing Group, a holding company consisting of several printing operations located in California, Illinois, New York, and Texas, decided to expand and upgrade its printing capabilities. Biltmore owned a four-color Hantscho press of the type that Ticor sought and expected delivery of a similar six-color press that was on order. As a result, during spring 1980, Ticor started negotiations to purchase Biltmore.

On November 25, 1980, Ticor and the Sollima brothers signed an agreement providing that Ticor would purchase Biltmore's assets. Ticor also promised to assume Biltmore's contract to buy the six-color press. The Sollima brothers agreed to serve as consultants to the successor company for one year and promised not to compete with the company for three years.

On December 9, Ticor and the Sollima brothers signed a second agreement. Under it, Ticor agreed to lease Biltmore's old Carson plant for nine months. Ticor planned to use the plant as a temporary base of operations while it refitted a much larger facility on which it had signed a 10-year lease.

At the same time it was making plans to purchase Biltmore's assets, Ticor was also making arrangements to hire Biltmore's production employees. Jeffries Lithograph, the subsidiary that Ticor had created to operate its new printing business, began interviewing job applicants. Jeffries interviewed 65 applicants, including all 20 of the old Biltmore production workers.

The Biltmore plant closed on December 19. On January 5, 1981, it reopened as Jeffries Lithograph. All 19 of the new company's production employees were former Biltmore employees. Biltmore's foreman, Wayne Clark, also came aboard.

When Jeffries opened on January 5, it planned to become a substantially larger operation than Biltmore had been. Biltmore's 1980 sales totaled $2 million. But Jeffries projected sales of $8.9 million in 1981 and $17 million in 1982.

The new company also made extensive plans to transform the old Biltmore business from a local "Mom and Pop" outfit into a growing national enterprise. During December 1980, Jeffries started hiring a management team and a national sales staff. Jeffries hired a vice-president, a chief estimator, 10 salespeople, a scheduler, a prep supervisor, a bindery supervisor, two press foremen, a prep foreman, a bindery foreman, and a plant superintendent. Except for the position of press foreman, Biltmore did not have comparable positions.

Jeffries also began preparing the newer, larger facility it had leased for the 10-year period. The company made various leasehold improvements that totaled about $1.5 million.

Finally, Jeffries refitted old and purchased new equipment. After modifying Biltmore's old four-color press and chang-

ing the new press order to double the six-color machine's capacity, Jeffries spent another $600,000 on improving the two presses after they were both in place. Jeffries also purchased $400,000 in finishing line equipment, which provided the company with the capacity to produce over 500 different items that neither Biltmore nor any other firm in the Western United States could produce.

Meanwhile, Jeffries's production staff steadily expanded. In April 1981, when the union demanded recognition, Jeffries employed 29 production employees, 19 of whom had worked for Biltmore. By October 1981, when the company moved to its new, permanent facility, it employed a full complement of 65 production workers, the same 19 of whom had worked for Biltmore.

### B. *The Union Demands Recognition*

In the months after Jeffries opened for business, the union sought recognition as the exclusive bargaining representative of Jeffries's production employees.[1] On January 14, 1981, Douglas Maloney, president of the union, wrote to Arthur Sollima and requested information about changes in Biltmore's status. On January 27, Sollima replied that Ticor had purchased Biltmore on December 19, 1980.

On February 20, 1981, the union wrote to Hugh McDonald, president of Jeffries, to demand recognition and request a meeting with company representatives. On March 4, McDonald wrote back to say the company refused to recognize the union. On March 25, Maloney sent a second letter demanding recognition. This letter was returned unopened due to insufficient postage, which the company refused to pay.

Later, on April 23, William Kerwin, a special union representative, visited the plant and asked to meet with McDonald. McDonald refused. Kerwin tendered the returned March 25 letter, but McDonald refused to accept the letter. Then, according to the administrative law judge, "Kerwin was informed that there was no further need for his presence and he was asked to leave." *Jeffries Lithograph Co.,* 265 N.L.R.B. 1499, 1502 (1982) (Wieder, A.L.J.). After Kerwin's failure to meet with McDonald, the union on the same day sent McDonald a mailgram demanding recognition and requesting a meeting. On April 24, McDonald responded to the mailgram by advising the union that "the company declines to recognize Local 262 as the representative of our production and maintenance employees." *Id.* at 1502.

When Kerwin visited the plant, 19 of Jeffries's 29 production employees were former Biltmore employees. The record shows that they were performing essentially the same work that they had performed for Biltmore, but that they were making about $2 per hour less and working about five hours per week more. *Id.* at 1501–02 & n. 11.

The union filed unfair labor practice charges. The ALJ held a hearing and found the company guilty of violating National Labor Relations Act § 8(a)(5), 29 U.S.C. § 158(a)(5) (1982), for failing to bargain with the certified bargaining representative.[2] The Board then filed this petition for enforcement.

## STANDARD OF REVIEW

■ We must enforce the Board's order unless, reviewing the record as a whole, we conclude that its factual findings are not supported by substantial evidence in the record or that it has incorrectly applied the law to those facts. *Premium Foods, Inc. v. NLRB,* 709 F.2d 623, 626–27 (9th Cir. 1983); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464,

---

1. After Biltmore's employees received their layoff notices in December 1980, union officials met with the Sollima brothers to discuss pending negotiations to sell Biltmore. Neither the Sollimas nor Ticor, however, notified the union when the two firms actually reached a purchase agreement.

2. The Board also found the company guilty of violating National Labor Relations Act § 8(a)(1), 29 U.S.C. § 158(a)(1) (1982), for interfering with the employees' right to engage in concerted activities.

95 L.Ed. 456 (1951) (applying same standard).

## ANALYSIS

### A. *Legal Background*

■ A successor employer is a firm which, having hired most of its employees from a predecessor employer's workforce, conducts essentially the same business that the predecessor did. *E.g., Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 627 (9th Cir.1983) (citing leading authorities). When a properly recognized or Board-certified union has represented the predecessor's employees, the law presumes that a majority of the successor's employees support the same union. *Id.* at 627. This presumption places the successor employer under a duty to bargain with the union over wages, hours, and working conditions. *See id.* at 630.

The reason for the presumption is that a mere change in ownership, without an essential change in working conditions, is not likely to change employees' attitudes toward union representation. *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 278–79, 92 S.Ct. 1571, 1577, 32 L.Ed.2d 61 (1972). If the Board and the courts failed to bind a successor to the labor law obligations of the predecessor, then the successor could deprive employees of the benefits they previously had won through collective action—a move that might disrupt industrial peace by disappointing workers's legitimate expectations in their terms of employment. *See, e.g., Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973); Goldberg, *The Labor Law Obligations of a Successor Employer*, 63 Nw. U.L.Rev. 735, 743–45 (1969).

Pointing to its extensive and successful plan for transforming the old Biltmore operation into a national enterprise, Jeffries contends that the scope and nature of its business is completely different from Bilt-more's. As a result, Jeffries reasons, we should not find that Jeffries is Biltmore's successor for purposes of imposing a bargaining obligation under § 8(a)(5).

In *Kallmann v. NLRB*, 640 F.2d 1094 (9th Cir.1981), we developed a two-part test for determining successorship in the context of imposing a duty to bargain. We held that the new owner of a business is a successor employer if (1) "the employer conducts essentially the same business as the former employer," and (2) "a majority of the new employer's work force are former employees or would have been former employees absent a refusal to hire because of anti-union animus." *Id.* at 1100 (citations omitted). Below, we briefly elaborate on each part of the test.

■ 1. *Essentially the same business.* Even though "a change in the scope of a business by a new employer does not, in itself, affect a successorship determination," *NLRB v. Hudson River Aggregates, Inc.*, 639 F.2d 865, 869 (2d Cir.1981), courts must weigh a number of factors in reviewing the Board's conclusion that the new employer conducts essentially the same business that the old employer conducted. Recently, the Board summarized, and we approved, seven of the factors that it considers, including whether

> [a] there has been a substantial continuity of the same business operations; [b] the new employer uses the same plant; [c] the same or substantially the same work force is employed; [d] the same jobs exist under the same working conditions; [e] the same supervisors are employed; [f] the same machinery, equipment, and methods of production are used; and [g] the same product is manufactured or the same service· [is] offered....

*Premium Foods, Inc.*, 260 N.L.R.B. 708, 714 (1982) (Barker, A.L.J.) (citation omitted), *enforced*, 709 F.2d 623 (9th Cir.1983).

This is not an exhaustive list.[3] Each factor merely helps the ALJ and the Board

---

**3.** *See, e.g., Westwood Import Co. v. NLRB*, 681 F.2d 664, 666 (9th Cir.1982) (listing some relat-ed factors).

determine whether the business is substantially the same. Throughout the inquiry, the touchstone remains whether there was an "essential change in the business that would have affected employee attitudes toward representation." *Premium Foods,* 709 F.2d at 627; *accord Hudson River Aggregates,* 639 F.2d at 869; *International Union of Electrical Workers v. NLRB,* 604 F.2d 689, 694 (D.C.Cir.1979); *Premium Foods, Inc.,* 260 N.L.R.B. at 714 (Barker, A.L.J.).

■■■ 2. *Majority of new employer's workforce.* The presumption that the old union should represent the new workforce applies only when a majority of the new workforce once worked for the old employer. Ideally, to fix a date for determining majority status, the Board would wait until the new employer has hired its "full complement" of workers. *See Burns,* 406 U.S. at 295, 92 S.Ct. at 1586 (dictum). But the federal labor policy favoring early representation and the exigencies of our economy do not permit the Board to wait until an uncertain future date when the employer can claim that it has hired every needed employee. *See, e.g., NLRB v. Pre-Engineered Building Products, Inc.,* 603 F.2d 134, 136 & n. 1 (10th Cir.1979). Therefore, we permit the Board to make a successorship determination when the new employer has achieved a "substantial and representative" complement of workers. *Premium Foods,* 709 F.2d at 628.

In determining whether the new employer has hired a substantial and representative complement of workers by a given date, the Board considers at least five factors, including (a) whether the job classifications designated for the operation "were filled or substantially filled"; (b) whether the operation was in "normal or substantially normal production"; (c) the size of the complement on the date of normal production; (d) the time expected to elapse before a substantially larger complement would be at work; and (e) the relative certainty of the employer's expected expansion. *Premium Foods,* 709 F.2d at 628.

■ Because "the point at which a successor employer has hired a sufficient complement of workers for determining the employer's bargaining obligation will vary from case to case," *Hudson River Aggregates,* 639 F.2d at 870, the Board cannot rely on simple mathematical formulae to help it resolve successorship questions, *see Pacific Hide & Fur Depot, Inc. v. NLRB,* 553 F.2d 609, 613 (9th Cir.1977). As a result, the Board does not give controlling weight to any single factor, *Premium Foods, Inc.,* 260 N.L.R.B. at 714 (Barker, A.L.J.), and the courts of appeals must consider the Board's decision in light of the totality of the circumstances, *see, e.g., Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 262 & n. 9, 94 S.Ct. 2236, 2243 & n. 9, 41 L.Ed.2d 46 (1974).

With the legal background in mind, we turn to the facts of the matter before us.

B. *Jeffries as a Successor Employer*

■ 1. *Essentially the same business.* The ALJ concluded, and the Board agreed, that despite the significant changes that Jeffries made in the Biltmore operation, the employing industry remained essentially the same. Recalling the seven factors from *Premium Foods, Inc.,* 260 N.L.R.B. at 714 (Barker, A.L.J.), we think substantial evidence supports this finding.

(a) *Substantially same operations.* —Jeffries continued substantially the same business operations that Biltmore had undertaken. Although Jeffries did not deal with all of Biltmore's former customers, it purchased most of Biltmore's key assets, including its printing presses. Like Biltmore, Jeffries stayed in the commercial printing business. And Jeffries started off with all of Biltmore's former employees on its production payroll. In short, even if the businesses were different, the *operations* were similar.

(b) *Same plant.*—Jeffries at first used the same plant that Biltmore used. We do not dispute that Jeffries planned to move to larger quarters, which were located only a block and-a-half away. But we do think its use of Biltmore's smaller Carson facility

is one more piece of evidence establishing continuity.

(c) *Substantially same workforce.*—Jeffries employed substantially the same workforce that Biltmore did. When Jeffries reopened on January 5, it had 19 production employees on the payroll—all of whom had worked for Biltmore. In fact, Jeffries failed to sign up only one of Biltmore's 20 production workers.

(d) *Same jobs and conditions.*—Jeffries's production employees performed the same work that they had performed for Biltmore: they worked the presses and completed other tasks associated with commercial printing operations. Even though Jeffries added different positions, developed an entirely different line of products, and delivered the results to different customers, the company did not significantly change the conditions under which old Biltmore production employees performed their tasks. Jeffries has failed to point to anything in the record indicating that the day-to-day life of its production employees was any different from that of Biltmore production employees. After considering the company's claim "that the changes it implemented were of such a character or magnitude as to change the products, employee classification or duties or working conditions," the ALJ found that facts to support the claim "were not presented in evidence." 265 N.L.R.B. at 1504 (Wieder, A.L.J.).

(e) *Same supervisor.*—Jeffries employed the same supervisor that Biltmore had employed. Wayne Clark was Biltmore's one and only foreman. We recognize that Jeffries created many new supervisory positions and filled them with non-Biltmore employees. But Jeffries could not have hired former Biltmore production supervisors for these spots, because there were none. In any event, we agree with the ALJ and the Board that Jeffries's decision to hire Clark constituted additional evidence of continuity.

(f) *Same machinery and equipment.*—Jeffries used some of the same machinery, equipment, and methods of production that Biltmore used. It is of no moment that Biltmore never used the six-color press. Biltmore had ordered the press and, had Biltmore stayed in business, would presumably have used it. At any rate, Jeffries built its operations around equipment and machinery that Biltmore had owned or would have owned.

(g) *Similar product or services.*—Finally, Jeffries offered essentially the same services—commercial printing—that Biltmore offered. Although the scope and distribution of the services changed, their basic character did not. Therefore, we conclude that substantial evidence supports the determination of the ALJ and the Board that Jeffries engaged in the same employing industry that Biltmore did.[4]

Jeffries contends that we should decline to enforce the Board's order not only because the company today is a far cry from the small "Mom and Pop" outfit that Biltmore was, but also because the Board has failed to distinguish this case from *Woodrich Industries, Inc.*, 246 N.L.R.B. 43 (1979).

Neither argument is persuasive.

As to the contention that the new company has outgrown the old one, we think Jeffries has misapprehended the gravamen of our inquiry. Successorship law does not

---

**4.** According to the company, equating Biltmore with Jeffries because both were "commercial printers" makes as little sense as equating a national bank with a local pawn shop because both are "commercial lenders." Brief for Respondent at 17.

We think this analogy is clever but misleading. The working environment in a national bank and that in a local pawn shop are worlds apart. Even though, for example, a bank loan officer and a pawn shop appraiser each help their businesses to make decisions about lending money, the skills and training that each brings to his task, as well as his day-to-day duties, completely defy comparison. Instead, we would compare the case before us to one in which a national bank has purchased a small, local branch office. A loan officer in the branch office would still make decisions about whom to extend loans to in the local community, but would do so with the resources of the larger parent behind him.

focus on whether the new employer has become a bigger and better business. Instead, the law focuses on whether business operations, "as they impinge on union membership, remain essentially the same after the transfer of ownership." *Hudson River Aggregates*, 639 F.2d at 869 (quotation omitted); *accord International Union of Electrical Workers*, 604 F.2d at 694. Standing alone, the magnitude of change is irrelevant. Unless the changes affect employees' *attitudes* toward representation, they do not undermine the presumption that the old union should bargain with the new employer. *See, e.g., Mondovi Foods Corp.*, 235 N.L.R.B. 1080, 1082 (1978); *Ranch-Way, Inc.*, 183 N.L.R.B. 1168, 1169 (1970); *see also* Note, *The Bargaining Obligations of Successor Employers*, 88 Harv.L.Rev. 759, 766 (1975) ("When the jobs which comprised the unit under the predecessor are largely absorbed by the successor, the change in employers is likely to have little impact upon the expectations of the members of the unit.").

This case is similar to *Saks & Co. v. NLRB*, 634 F.2d 681 (2d Cir.1980). In *Saks*, the new employer, Saks, tried to distinguish its expanded and relocated sewing operations from those once operated by the old employer, Gimbels. In holding that substantial evidence supported the Board's finding of successorship, the Second Circuit said:

> [T]he actual service rendered and the methods by which that service is performed remain unchanged. The work requires the use of the same skills: sewing, cutting, and working with fabric. Saks asserts that its alterations employees perform, for the first time, work on men's and children's clothing in addition to women's clothing. There is no evidence, however, that the skills involved are materially different, or that special training or equipment is required. On the contrary, the minor change in the work of the alterations employees is not sufficient to prevent a finding of successorship.

*Id.* at 686 (citations omitted).

Similarly, nothing in the record before us indicates that Jeffries's very successful plans for expanding the old Biltmore operation changed the working life of production employees in a way that materially affected their attitudes toward union representation. Production employees for both firms operated and maintained presses and performed all the tasks associated with a commercial printing business. They did not have to learn entirely new skills, a fact that probably explains why Jeffries retained virtually every member of the old Biltmore production unit.

As to the contention that *Woodrich* is indistinguishable, we disagree. In that case, the new employer, like Jeffries, made extensive changes in the plant, purchased new equipment, invested in improvements, and retained only one supervisor that had worked for the old employer. The Board concluded that the new employer was substantially different from the old. In so doing, however, the Board relied in part on a crucial change in the employing industry that affected employees's attitudes toward union representation: the new employer switched from making uniforms to making fashion industry garments. Under the old regime, each operator performed only one task, such as setting the same pocket on each uniform. But under the new regime, sewing machine operators had to perform several, varied tasks, such as setting different parts of different garments. The transformation from a routinized environment to a more flexible one required the employer to make corresponding changes in workplace government that undermined the Board's presumption of the union's continued majority status. *See Woodrich*, 246 N.L.R.B. at 43.

We hold that substantial evidence supports the Board's finding that Jeffries engaged in essentially the same business that Biltmore did.

2. *Majority of new employer's workforce.* The ALJ and the Board also concluded that substantial evidence supports the Board's finding that Jeffries's bargaining obligation matured in April 1981, when

the union demanded recognition. At that time, 19 of Jeffries's 29 production employees—about 65% of the bargaining unit—had worked for Biltmore. But Jeffries argues that the proper date on which to determine whether the bargaining obligation had matured is October 1981, when the company moved to its permanent facility. At that time, 19 of Jeffries's 65 production employees—just 29% of the bargaining unit—had worked for Biltmore.

■ Jeffries urges us to determine the bargaining obligation as of October 1981 because by then it had hired its full complement of employees. Our court, however, has held that the Board may determine whether the bargaining obligation has matured when the new employer has hired merely a "substantial and representative complement." *Premium Foods,* 709 F.2d at 628. Therefore, we must decide whether substantial evidence supports the Board's finding that Jeffries had assembled a representative complement in April 1981. After reviewing the evidence as a whole, in light of the five factors we set out in *Premium Foods,* we find that such evidence exists.

(a) *Substantially filled job classifications.*—We cannot say with certainty whether Jeffries had substantially filled its designated job classifications by April. The record shows that Jeffries did not fill all of its anticipated production unit positions until October, when it assembled a full complement of production employees. On the other hand, by April, Jeffries had plenty of business and had filled enough positions to operate at full capacity in the old Biltmore plant. It was operating at "normal" production, as we used that phrase in *Premium Foods.* See 709 F.2d at 628–29. Because we may read this factor to favor either the April or October dates, it does not control our review of the Board's determination.

(b) *"Normal" production.*—By April, Jeffries had already attained the employment and production levels of Biltmore, its predecessor. The Board could reasonably find that this constituted "normal" production within the meaning of *Premium*

*Foods. See id.* at 628–29. Therefore, this factor weighs in favor of the April date.

(c) *Size of complement on normal production date.*—Jeffries had hired 29 of a projected 65 production workers by April. This was nearly 45% of its projected total. Because 45% constituted a significant share of the eventual complement, we think this factor also weighs in favor of the April date.

(d) *Time to elapse before full complement at work.*—Jeffries took over the Biltmore operation in December 1980 and officially reopened it in January 1981. Although Jeffries carried out very specific, and eventually successful, plans to expand the old Biltmore operation, it did not expect to achieve full production, and to hire a full complement, until the end of the year. In fact, it did not do so until October 1981.

We think the ALJ and the Board had reason to conclude that the eight-month period from reopening until full production was too long to wait before determining whether Jeffries's bargaining obligation had matured. "[W]e have found no decision postponing determination of a successor employer's bargaining obligation for so long an interval following the commencement of its operations." *Hudson River Aggregates,* 639 F.2d at 870 (nearly seven months an unacceptable interval); *cf., e.g., Pacific Hide & Fur,* 553 F.2d at 614 (two months acceptable).

In some cases, "it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union." *Burns,* 406 U.S. at 295, 92 S.Ct. at 1586. "But we do not believe that an employer may always delay its bargaining obligations until it has expanded its business to the proportions contemplated when it purchased the enterprise." *Hudson River Aggregates,* 639 F.2d at 870.

In the present case, the Board decided that Jeffries had achieved a representative complement of both work and workers well before eight months had passed. There-

fore, we think this factor, too, weighs in favor of the April date.[5]

(e) *Relative certainty of employer's expansion.* Finally, Jeffries's expectations regarding expansion proved remarkably accurate. By April, the production complement had already expanded from 19 to 29. By June, less than two months later, the unit had reached 39—and Biltmore employees no longer constituted a majority. By October, when Jeffries moved to its new facility, the unit had reached the full complement of 65. Like its plans to expand capacity and invest new capital, the new company's plans to hire more personnel materialized on schedule.

We think this factor, then, weighs in favor of the October date.

In sum, three of the factors we articulated in *Premium Foods* favor the April date, one favors the October date, and one could favor either date. Although this is arguably a close question, the record supports the Board's determination that the balance of factors supports the ALJ's conclusion that the proper date on which to assess Jeffries's bargaining obligation was April 1981, the date that the union demanded recognition. Thus, we hold that substantial evidence supports the Board's order.

Jeffries complains vigorously that the ALJ misread the record when she labeled as "too indefinite and speculative" the company's planned personnel growth. 265 N.L.R.B. at 1505 (Wieder, A.L.J.).

We disagree with Jeffries's characterization. The ALJ pointed out that she based her conclusion in part on "the exigencies of the economic climate," *id.,* and not on the company's projections themselves. According to the record, Jeffries made extensive plans to expand its operations and then executed those plans. At oral argument, counsel for Jeffries insisted that the company acted in good faith, and we have no reason to believe otherwise. We note only

that the definiteness of the company's plans was merely one factor to consider, and that the ALJ could properly discount this factor in light of other factors, such as the uncertainty of the external economic forces that might have slowed the firm's growth during the eight months it eventually took to carry out the plans. This is a balancing test. But it is a balance we think the ALJ, as finder of fact, is in a superior position to make. *See, e.g., Pre-Engineered Building Products,* 603 F.2d at 136 ("The process of identifying a full complement thus involves balancing the objective of insuring maximum employee participation in the selection of a bargaining agent against the goal of permitting employees to be represented as quickly as possible." (footnote omitted)).

We hold that the record supports the Board's determination that Jeffries had assembled a substantial and representative complement of employees by April 1981.

## C. *Other Arguments*

Jeffries attacks on two other grounds the Board's finding that the company succeeded to Biltmore's bargaining obligation. They are, first, that the Board's order interferes with employee free choice, and second, that the Board's decision imposes an onerous burden on new employers in Jeffries's position. For the reasons we articulate below, we find neither contention persuasive.

1. *Employee free choice.* If allowed to stand, the Board's order, argues the company, will deny employees who never worked for Biltmore the opportunity to decide whether they want to be represented by the union.

We think Jeffries exaggerates the danger. The period immediately following a change in the employment relationship can destabilize the working environment. Yet this is the time when employees, both holdovers and new hires, may need stability in

**5.** Jeffries submits that by June 1981, just one month after the union demanded recognition, former Biltmore employees no longer constituted a majority of the production unit. Because we have already had occasion to consider and

reject this type of argument, *see Bellingham Frozen Foods, Inc. v. NLRB,* 626 F.2d 674, 679–80 (9th Cir.1980), *cert. denied,* 449 U.S. 1125, 101 S.Ct. 941, 67 L.Ed.2d 111 (1981), we do not discuss it further here.

their working environment most. A collective voice can help them achieve this stability by guarding against sudden changes in terms and conditions of employment. Recognizing this problem, the courts of appeals have developed, and the Supreme Court has endorsed, the successorship presumption. *See* Note, *The Bargaining Obligations of Successor Employers, supra,* at 762; *cf. Westwood Import Co. v. NLRB,* 681 F.2d 664, 668 (9th Cir.1982) ("[T]he prerogative of employers to rearrange their business[es] must be balanced by some protection to employees affected by abrupt changes in the employment relationship.").

■ Moreover, in the event that a majority of employees become dissatisfied with the old union, the law provides several options. The employees may petition for decertification. *Westwood Import,* 681 F.2d at 667 n. 3. The employer may demonstrate that a majority of holdover employees actually reject the union. *NLRB v. Edjo, Inc.,* 631 F.2d 604, 607 (9th Cir.1980). Or the employer may show that its newly-hired employees disfavor the union. *Id.* at 607.

■ 2. *Onerous burden on new employers.* Jeffries also asserts that the Board would place the company under a weighty and difficult obligation unless we deny enforcement. Again, we think Jeffries exaggerates the problem. The successorship doctrine imposes a duty to bargain in good faith under § 8(a)(5), not a duty to accept the terms of the old union contract. *Burns,* 406 U.S. at 281–82, 92 S.Ct. at 1579. The successor merely has to sit down at the bargaining table. We think this obligation is simple, fair, and reasonable.

## CONCLUSION

Because substantial evidence supports the finding that Jeffries Lithograph Co. is the successor employer to Biltmore Press, Inc., we ENFORCE the order of the National Labor Relations Board.