**HAWAII CARPENTERS TRUST FUNDS (Health & Welfare Trust Funds by its Trustees Raymond Nagata, Albert Hamamotio, Henry Iida, Roy Iwamoto, Robert Kaya, Fred Shelton, Harold Makilan, Herman Nascimento, Lester Tamura and Mitsuo Yakuma, et al.), Plaintiffs-Appellants,**

v.

**WAIOLA CARPENTER SHOP, INC., a Hawaii corporation, and Tanaka and Uyehara, Inc., a Hawaii corporation, now doing business as Waiola Countertop, formerly doing business as Waiola Carpenter Shop, Defendants-Appellees.**

No. 86–1824.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1986.

Decided July 27, 1987.

---

Wesley H. Ikeda, Honolulu, Hawaii, for plaintiffs-appellants.

Gregory M. Sato, Honolulu, Hawaii, for defendants-appellees.

Before NELSON, REINHARDT and WIGGINS, Circuit Judges.

REINHARDT, Circuit Judge:

Hawaii Carpenters' Trust Funds, employee benefit trusts established pursuant to the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c), and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1101 et seq., brought suit to recover unpaid ERISA trust fund contributions from Tanaka & Uyehara, Inc. According to the Trust Funds, T & U was obligated to contribute monies under the 1978–81 collective bargaining (Mill Cabinet) agreement as a successor employer to the original signatory and under the 1981–84 collective bargaining agreement as a member of a multiemployer bargaining association (WPA). The district court granted T & U's motion for summary judgment. *Hawaii Carpenters' Trust Funds v. Waiola Carpenter Shop, Inc.*, 627 F.Supp. 237 (D.Hawaii 1985). The Trust Funds appeal. We reverse.

## I. *Facts*

Waiola Carpenter Shop, Inc., entered into a collective bargaining agreement with the United Brotherhood of Carpenters & Joiners of America, Local 745, AFL–CIO (Carpenters' Union) for the period 1978–1981. The standard "Mill Cabinet Agreement" was executed on behalf of the company by its owner Robert Imai. The agreement obligated signatories to make contributions to the various Hawaii Carpenters' Trust Funds. At the beginning of the contract period, Waiola employed two workers, Calvin Tanaka and Duffy Uyehara. Both were union members. Imai also performed work in the shop, primarily the delivery of finished products and the pickup of raw materials.

In late 1979, Tanaka and Uyehara formed a corporation, Tanaka and Uyehara, Inc. (T & U), and purchased Waiola Carpenter Shop from their employer, Imai. The changeover in ownership was effective May 1, 1980. In an effort to promote their new business, Tanaka and Uyehara sent the following notice to Waiola's customers:

Dear Waiola Carpenter Shop Customers:

Effective May 1, 1980, Waiola Carpenter Shop ... will be under the new management of Calvin Tanaka and Duffy Uyehara.... If you are presently doing business with us, we appreciate your patronage and we will continue to provide you with quality service and workmanship. We will operate with the same street address, telephone number, business office location, policies and personnel.... We have been very pleased to work with you in the past and look forward to this opportunity for the future.

T & U continued to operate the business under the name Waiola Carpenter Shop for some period, but later adopted the trade name "Waiola Countertop."

After their purchase of Waiola, Tanaka and Uyehara continued to perform their former duties in the fabricating shop. They also hired a series of non-union employees to perform the duties Imai had previously performed. None of the subsequently hired employees was a union member.

From May 1980 through December 1981, T & U received monthly trust fund assessment notices from the Hawaii Carpenters' Funds, pursuant to the 1978–81 Mill Cabinet Agreement. T & U continued to report the hours worked by all of its employees, including Tanaka and Uyehara. Although it continued to make contributions for Tanaka and Uyehara, it failed to make them for the non-union employees who assumed Imai's duties. Both Tanaka and Uyehara submitted claims for benefits under the various funds. During this period, Tanaka's rights under the pension trust fund became vested and Uyehara acquired additional vested benefits.

On December 23, 1981, T & U received a letter from the Trust Funds demanding payment of delinquent contributions, primarily for the non-union employees. T & U did not make the requested contribution. Moreover, beginning January 1982, T & U ceased contributing to the Funds entirely and stopped reporting hours worked.

The Mill Cabinet Agreement expired on July 31, 1981. Earlier that year, T & U had joined the Building Industry Association of Hawaii and had thereby become a member of the Wood Products Association of Hawaii (WPA), an affiliated organization. In July, Percy Ching, President of the WPA, visited T & U and asked Uyehara to sign a "survey form." The form authorized the WPA, a multiemployer bargaining association, to represent the signatory's interests in the upcoming negotiations with the Carpenters Union. Uyehara executed the form on behalf of T & U;[1] both T & U and the WPA subsequently referred to the form as a power of attorney. Uyehara or Tanaka occasionally attended meetings of the WPA, at some of which progress of the labor negotiations was reported on. Neither participated in any of the actual negotiating sessions between the WPA and the union.

The WPA, a multiemployer association, commenced negotiations on behalf of its members with the Carpenters' Union in August 1981. On September 2, 1981, Percy Ching, president of the WPA, sent a memorandum to "Millwork Industry Signatories" including T & U, announcing that a tentative agreement had been reached. As the memorandum stated:

> If approved, the contract will bind all Association members and other non-member firms which have given the power-of-attorney to the Association to represent them in negotiations.

Shortly afterwards, a dispute arose that resulted in a strike and a lawsuit by the union. The strike was eventually settled, the suit dismissed, and a formal collective bargaining agreement was entered into on February 25, 1983. The agreement was made retroactive to August 1, 1981.[2] It was expected that each member of the multiemployer association would sign the agreement. T & U refused to do so.

On January 14, 1982, slightly more than a year before the formal agreement with the union was reached, T & U purported to withdraw from the multiemployer association. While conceding that it had given WPA its "power of attorney for bargaining purposes," T & U claims to have been deceived by Percy Ching, President of the WPA, as to the effect of signing the form.[3]

---

1. The survey form was the following:

IMPORTANT - RESPONSE NEEDED
TO
SUBJECT: 1981 Millwork Industry Negotiations

Please check the appropriate box in the survey form below, and place this completed sheet in the enclosed self-addressed envelope by June 1, 1981.

The Wood Products Association of Hawaii, formerly the Millcabinet Industry, has indicated to the Carpenters Union Local 745 that it will be the official representative for signatory millwork companies in the forthcoming negotiations. In order to validate that claim and to insure that the interest of the entire millwork industry are protected, the Association would very much appreciate your taking the time to fill out this form and returning it at your earliest convenience, and no later than June 1.

Thank you for your kokua.

Respectfully,
/S/Percy Ching
Percy Ching
President
Wood Products Assn. of Hawaii

To: Wood Products Association of Hawaii
Attention: Mr. Percy Ching, President

With respect to representation of my company's interest in the forthcoming negotiations involving the Millwork Industry:

[ ] I authorize the Wood Products Association to do so in our company's bahalf.

[ ] My company will independently negotiate with the Carpenters Union.

Signed by _____
Company _____
Position in Company _____
Date _____

2. We note that there is some controversy both as to precisely what was agreed to and as to the propriety of the resolution of certain issues by an arbitrator. However, on this appeal from the grant of summary judgment for T & U, we are required to construe the facts in favor of the Funds.

3. Uyehara's letter to the WPA states:

According to the district court, "Ching had represented to Tanaka and Uyehara that despite their signatures on the "Survey Form" (or power of attorney), each company would have the option of signing their own agreement." 627 F.Supp. at 242. The court also stated that "Percy Ching advised Tanaka and Uyehara extensively on labor matters. In fact, both parties agreed Mr. Ching may have been practicing law without a license." *Id.* at 240. About two weeks after Uyehara's letter purporting to withdraw from the WPA, both Uyehara and Tanaka resigned from the union.

Neither the Union nor the Funds were notified that T & U had sought to withdraw from the WPA until after the agreement on the new contract had been reached. In March of 1983, representatives from the Carpenters' Union twice asked Uyehara to sign the contract on behalf of T & U. Uyehara refused, citing for the first time the purported withdrawal.[4]

On March 4, 1983, Hawaii Carpenters' Funds filed suit against Waiola Carpenter Shop, Inc. and T & U to recover delinquent trust fund contributions under the 1978–81 Mill Cabinet Agreement. Three months later, the Funds amended the complaint to include unpaid contributions under the 1981–84 collective bargaining agreement. The district court granted defendants' motion for summary judgment on both counts. As to the 1978–81 agreement, the court ruled that T & U was not a "successor employer" to Waiola Carpenter Shop, and, accordingly, was not bound by Waiola's collective bargaining obligations. As to the 1981–84 agreement, the court found that Ching's representations to T & U constituted "unusual circumstances" justifying T & U's withdrawal from the multiemployer association. In addition, the court ruled that a one year state statute of limitations was applicable to both actions. The court erred with respect to all three rulings.[5]

## II. *T & U's Successorship and Obligation Under the 1978–81 Mill Cabinet Agreement*

The Funds contend that T & U was a "successor employer" to Waiola and thus obligated to contribute to the employee benefit trusts under the 1978–81 collective bargaining agreement. T & U argues that it was not a "successor" and was not bound by the terms of the collective bargaining agreement.

In a series of cases, we have set forth the requirements for finding that a new employer is a "successor employer." *NLRB v. Jeffries Lithograph Co.,* 752 F.2d 459, 463–69 (9th Cir.1985); *Kallmann v. NLRB,* 640 F.2d 1094, 1100–01 (9th Cir. 1981); *Premium Foods, Inc. v. NLRB,* 709 F.2d 623, 627 (9th Cir.1983). As the Supreme Court has stated, "the focus is on whether there is 'substantial continuity' between the enterprises." *Fall River Dyeing & Finishing Corp. v. NLRB,* —— U.S. ——, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987). The inquiry we undertake is more functional than formal.

In *Jeffries Lithograph,* we listed a number of factors to be considered in making a determination of successorship. Those factors include:

> This is to inform the Wood Products Association of Hawaii that we are withdrawing as a member. We had previously given the Association our power-of-attorney for bargaining purposes without understanding the total implications of that action. We agreed to do so only with the intent of being part of the group and that we would have the opportunity to review the completed agreement before making a decision to sign as an individual signatory or not.

**4.** T & U's argument on appeal is that it withdrew effectively from the multiemployer association and not that it remained a member but was not obligated to sign the new agreement.

> The reason is apparent. Individual members to multiemployer units are bound by the agreement reached as a result of the multiemployer negotiations whether or not they sign. "Once [a multiemployer] agreement has been reached, ... it is an unfair labor practice for a party to refuse to sign the written contract." *NLRB v. Beckham, Inc.,* 564 F.2d 190, 194 (5th Cir.1977). *See also infra* n. 13. The signature serves primarily to prove that the employer has notice of the terms and conditions of the agreement.

**5.** T & U does not assert in support of the district court's ruling any other defense to the claims other than those described in the text.

[Whether] [a] there has been a substantial continuity of the same business operations; [b] the new employer uses the same plant; [c] the same or substantially the same work force is employed; [d] the same jobs exist under the same working conditions; [e] the same supervisors are employed; [f] the same machinery, equipment, and methods of production are used; [g] and the same product is manufactured or the same service [is] offered.

752 F.2d at 463 (quoting *Premium Foods, Inc.*, 260 NLRB 708, 714 (1982) (Barker, A.L.J.), *enforced*, 709 F.2d 623 (9th Cir. 1983)).

Here, each *Jeffries* factor is present but one—"the same supervisors." T & U argued before the district court that because Tanaka and Uyehara now owned the business and were acting as "supervisors," T & U could not be considered a successor employer.

■ The primary question in successorship cases is whether, under the totality of the circumstances, there is "substantial continuity" between the old and new enterprise. The absence of one *Jeffries* factor does not cause us to conclude that T & U was not a "successor." *See, e.g., Trustees for Alaska Laborers-Constr. Indus. Health & Sec. Fund v. Ferrell*, 812 F.2d 512, 516 (9th Cir.1987) ("[O]n balance, the evidence indicates that Ferrell is a successor."). The factors that are present and point toward continuity are both more numerous and more compelling. In addition, we note that T & U represented itself as Imai's successor in its letter to his former customers. *See* Fed.R.Evid. 801(d)(2). Here, we hold that the undisputed facts demonstrate sufficient continuity in the enterprise to require the legal conclusion that T & U was the successor to Waiola.[6]

T & U makes two additional arguments with respect to the 1978–81 Mill Cabinet Agreement. T & U argues that even if it were a successor: (1) it was not required to make trust fund contributions because it was not a party to any "writing" providing for employer contributions to the employee benefit trust funds, and (2) it was not bound to its predecessor's and the Union's agreement as to the terms and conditions of working at Waiola, and therefore is not liable for the allegedly delinquent fund contributions.

■ Section 302(c)(5) of the LMRA requires that payments by employers which are to be held in trust for the benefit of employees must be governed by a detailed written agreement specifying how payments are to be made. 29 U.S.C. § 186(c)(5). The primary purpose of this requirement is to "insur[e] that the trust funds [are] not tampered with or used for illicit purposes." *Thurber v. Western Conference of Teamsters Pension Plan*, 542 F.2d 1106, 1108 (9th Cir.1976). Where, as here, there is a valid original agreement and writing entered into by the predecessor employer, the requirements of a writing under the statute are satisfied as far as the successor employer is concerned. *See Ferrell*, 812 F.2d 512; *Carter v. CMTA-Molders & Allied Health & Welfare Trust*, 736 F.2d 1310, 1313 (9th Cir.1984); *Arizona Laborers Local 395 Health and Welfare Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1520–21 & n. 13 (9th Cir.1985).

■ A successor employer is required to abide by the terms and conditions of employment established by its predecessor's collective bargaining agreement unless and until it has timely bargained to an "impasse" with the incumbent union. *See generally Fall River Dyeing*, 107 S.Ct. 2225; *Carter*, 736 F.2d at 1312; *NLRB v. Edjo*,

---

6. We note that the fact that Tanaka and Uyehara might be considered for some purposes to be "supervisors" does not mean that they may not be considered part of the current workforce for purposes of determining successorship. *Cf. Waggoner v. Dallaire*, 649 F.2d 1362, 1369 (9th Cir.1981) (noting "settled" rule that "where an employee splits his worktime between a position covered by the [collective bargaining agree-

ment] and [a] position not covered, the employer must contribute for *all* the hours the employee works or is paid."). Despite their acquisition of the company, Tanaka and Uyehara continued to perform their former duties in substantially the same fashion as they had when Imai owned Waiola. Thus, there is some doubt that even the one *Jeffries* factor relied on by T & U is absent.

*Inc.*, 631 F.2d 604, 607–08 (9th Cir.1980). Here, T & U did not bargain with the union at all. Rather, according to Tanaka's affidavit: "After purchasing the assets of Waiola on April 30, 1980, the Trust Funds continued to submit monthly trust fund assessment notices ... and we continued to make contributions [for the remainder of the contract term] on the belief we were obligated to do so." [7]

■ We hold that T & U is liable for delinquent contributions to the Carpenters' Funds under the 1978–81 Mill Cabinet Agreement.[8]

### III. *T & U's Obligation to Contribute to the Trust Funds Under the 1981–84 Agreement*

Hawaii Carpenters Funds also contend that T & U is liable for delinquent contributions required by the 1981–84 multiemployer collective bargaining agreement between the Wood Products Association (WPA) and the Carpenters Union. The district court granted T & U's motion for summary judgment on the ground that "unusual circumstances" warranted T & U's withdrawal from the WPA after contract negotiations had begun.

Over forty percent of collective bargaining agreements covering 1,000 or more employees are "multiemployer agreements." *See Charles D. Bonanno Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 410 n. 4, 102 S.Ct. 720, 724 n. 4, 70 L.Ed.2d 656 (1982). The National Labor Relations Board has long interpreted the National Labor Relations Act, 29 U.S.C. § 157 et seq., as permitting the establishment of multiemployer bargaining units. *See Shipowners Ass'n of the Pac. Coast*, 7 NLRB 1002, 1024 (1938), *review den. sub nom. AFL v. NLRB*, 103 F.2d 933 (D.C.Cir.1939), *aff'd*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940); *Taylor Motors, Inc.*, 241 NLRB 711 (1979) (ruling that absence of multiemployer bargaining history is not determinative of the inappropriateness of a multiemployer unit). Multiemployer bargaining is "a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining." *NLRB v. Truck Drivers Local Union No. 449 (Buffalo Linen)*, 353 U.S. 87, 95, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957).

Multiemployer associations are voluntary. The establishment of a multiemployer association is pursuant to contract among the members. Federal labor law does not preclude an employer from withdrawing from an association so long as federal interests are not implicated by that action. However, the National Labor Relations Board and the courts have developed rules governing the time and manner of withdrawals from multiemployer bargaining associations. The purpose of the withdrawal rules is to promote stability in bargaining relationships, especially during the period negotiations are being conducted.

■ Whenever an employer desires to withdraw from a multiemployer association that represents it for purposes of collective bargaining, it is required to provide written notice to the union prior to the date established for modification of the contract or for the commencement of negotiations.[9]

---

7. It is interesting to note that Uyehara acquired additional vested benefits, Tanaka's rights became vested, and both submitted claims for benefits during this period.

8. In light of our holding, we need not reach the question whether T & U "adopted" the terms and conditions of the collective bargaining agreement. We note, however, that an employer may be held to have done so by embarking on a course of conduct evincing an intention to be bound. The strong federal policy in favor of the strengthening of collective bargaining by enforcing the terms of contracts is one factor militating in favor of finding adoption by conduct. *See Audit Servs., Inc. v. Rolfson*, 641 F.2d 757, 763–64 (9th Cir.1981); *cf. Vin James Plas-*

*tering Co.*, 226 NLRB 125, 130 (1976) (employer was bound by a collective bargaining agreement where it had "engaged in a course of conduct which manifested an intention to adopt and be bound by [it].").

9. As the NLRB stated in its seminal decision in *Retail Associates*: "We would accordingly refuse to permit the withdrawal of an employer or a union from a duly established multiemployer bargaining unit, except upon adequate written notice given prior to the date set by the contract for modification, or to the agreed-upon date to begin the multiemployer negotiations." *Retail Assocs., Inc.*, 120 NLRB 388, 395 (1958).

An employer is always permitted to withdraw by "mutual consent." *Retail Associates*, 120

"[I]t is well settled now that an attempted withdrawal ... [during] negotiations is neither timely nor effective." *Sheridan Creations, Inc.*, 148 NLRB 1503, 1505 (1964), *enforced*, 357 F.2d 245 (2d Cir.1966), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967). Accordingly, for T & U to have validly withdrawn from the WPA, it would have had to have given written notice to the union prior to the commencement of negotiations.[10] Here, T & U not only failed to give notice to the union at any time, it also attempted to withdraw after negotiations had commenced.[11]

The district court relied on an exception to the rule requiring withdrawal prior to the commencement of negotiations, finding that "unusual circumstances" existed. We note first of all that even were the district court correct regarding the existence of "unusual circumstances", T & U's withdrawal would still have been ineffective since the company failed to provide notice to the union. However, the court also clearly erred in reaching its conclusion that there were "unusual circumstances." The basis for the district court's conclusion was the alleged misrepresentations to T & U by the President of the WPA, Percy Ching.

Such misrepresentations do not constitute "unusual circumstances."

■ We have given "unusual circumstances" a narrow and restrictive construction. The exception is generally limited to cases in which the employer faces such dire economic circumstances that its "very existence ... as a viable business entity has ceased or is about to cease." *Hi-Way Billboards, Inc.*, 206 NLRB 22, 23 (1973), *enforcement denied*, 500 F.2d 181 (5th Cir. 1974).[12] What T & U claims to be "unusual circumstances" is a fraudulent inducement to join the multiemployer association—a fraud allegedly perpetrated by the association itself. The existence of any such fraud would not threaten the basic ability of the employer to exist as an enterprise and would therefore not justify our making an exception to the normal rules. The overriding federal interest in promoting stable collective bargaining requires that disruptions of the bargaining relationship be excused only on a showing of fundamental necessity—and not merely as the result of a claim, for example, that someone may have misled the employer. Thus, T & U simply does not fall within the "unusual circumstances" exception.[13]

NLRB at 395. Where there is genuine mutual consent, the requirements of the general rule are considered to be satisfied.

10. Since T & U was a first time member of the WPA, it would not have been required to have given notice under any prior multiemployer contract.

11. We note that where an employer validly withdraws from a multiemployer bargaining association, its duty to bargain with the union continues nonetheless. *See, e.g. Holiday Hotel & Casino*, 228 NLRB 926 (1977), *enforced*, 604 F.2d 605 (9th Cir.1979).

12. We held, for example, in *H & D, Inc. v. NLRB*, 670 F.2d 120, 122–23 (9th Cir.1982), that the mass resignation of an employer's employees from a union was not an "unusual circumstance" justifying withdrawal. *See also Sheridan Creations, Inc.*, 148 NLRB at 1505–06.

Similarly, the Board has interpreted "unusual circumstances" narrowly. For example, it has refused to permit withdrawal from a multiemployer association where: 1) all the employer's employees were discharged, *John J. Corbett Press, Inc.*, 163 NLRB 154 (1967), *enforced*, 401 F.2d 673 (2d Cir.1968); where the employer has

been suspended from the association for failure to pay its dues, *Senco, Inc.*, 177 NLRB 882 (1969); and where the employer has suffered a sharp decline in business, *Serv-All Co.*, 199 NLRB 1131 (1972), *enforcement denied on other grounds*, 491 F.2d 1273 (10th Cir.1974).

13. It is also significant that T & U had the opportunity to peruse the tentative terms of the collective bargaining agreement before it attempted to withdraw. In *Detroit Window Cleaners Union*, the NLRB dismissed an unfair labor practice charge by an employer who alleged that the union had failed to bargain after the employer's effective withdrawal from the multiemployer association. As the Board stated in it decision dismissing:

[The employer] never gave the Respondent [union] notice that it had withdrawn from the multiemployer collective-bargaining unit or resigned from the Association until after contract negotiations had been concluded. Instead, it stood by while negotiations were being conducted, keeping informed of the progress of these negotiations, without giving the Respondent the slightest reason to believe that the Association was no longer bargaining on its behalf. Indeed, it was only after negoti-

We hold that T & U's purported withdrawal from the WPA was ineffective.[14] Accordingly, it is liable for the delinquent trust fund contributions.[15]

## IV. Limitations of Actions for Collection Under ERISA

Where a federal statute does not provide a limitations period for bringing a cause of action, a court must select a period from a statute governing analogous causes of action. The district court ruled that a Hawaii statute of limitations was appropriate for actions seeking to recover delinquent contributions from an employer under ERISA. 29 U.S.C. § 1132. 627 F.Supp. at 243. The statute selected, Haw.Rev.Stat. § 657–11, provides that the period of limitations for a federal cause of action that "imposes a new liability or enlarges any existing liability" is one year.[16]

We note that the Hawaii statute selected by the district court cannot apply by force of state law to federal causes of action filed in federal court. *Cf. Reconstruction Finance Corp. v. Beaver Co.*, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946); *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942). Moreover, the statute selected by the district court on its face applies only to actions "brought in a state court." Haw. Rev.Stat. § 657–11.

Although there are strong reasons for creating a uniform federal rule governing the limitation of actions for collection of delinquent ERISA contributions—including the fact that multiemployer trust funds may cover employers operating in a number of states—our circuit is not free to adopt such a rule, except through the en

---

ations were concluded and after it had received a requested preliminary copy of the agreement ... that [the employer] notified the Respondent that it had resigned from the Association and was therefore not obligated to sign the agreement.

126 NLRB 63, 64–65 (1960). *See also Walker Elec. Co.*, 142 NLRB 1214 (1963).

**14.** We note that the NLRB has held that ineffective withdrawal from a multiemployer bargaining unit constitutes an unlawful refusal to bargain in violation of section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5). *See Teamsters Union Local 378*, 243 NLRB 1086 (1979), *remanded*, 672 F.2d 741, 745 & n. 2 (9th Cir.1982). Accordingly, T & U may have committed an unfair labor practice. For this reason, T & U contends that these proceedings should have been brought originally before the NLRB. We agree with the district court that they do not fall within the primary jurisdiction of the NLRB. 627 F.Supp. at 241 n. 4.

In *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 779 F.2d 497 (9th Cir.1985), *cert. granted*, — U.S. —, 107 S.Ct. 1283, 94 L.Ed.2d 142 (1987), we dismissed an action seeking recovery of unpaid trust fund contributions and suggested that the fund file an unfair labor practice charge. The basis for our holding was that the allegedly delinquent contributions accrued during the period after expiration of the collective bargaining agreement and prior to impasse. We have held, however, that the *Advanced Lightweight* rule is inapplicable to contributions owed for periods within the term of a contract. *See Office & Prof'l Employees Ins. Trust Fund v. Laborers Funds Admin. Office, Inc.*, 783 F.2d 919 (9th Cir.1986). *See generally* Fillion & Trebilcock,

*The Duty to Bargain under ERISA*, 17 Wm. & Mary L.Rev. 251 (1975) (discussing the relationship between rules governing bargaining and the requirements of ERISA).

**15.** There is an entirely separate ground not raised by the parties that would appear to bar T & U's defense of fraud. Where, as here, the fraud is in the inducement and the perpetrator is not the Fund itself, the employer does not have a defense to a collection action under 29 U.S.C. §§ 1132(a), 1145. *See Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769 (9th Cir.1986); *Operating Eng'rs Pension Trust v. Gilliam*, 737 F.2d 1501 (9th Cir.1984); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 87, 102 S.Ct. 851, 861, 70 L.Ed.2d 833 (1982) (noting Congress' strong disapproval of the fact that "'simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions'") (citation and emphasis omitted).

**16.** Hawaii Revised Statutes, section 657–11 provides:

*Recoveries authorized by federal statute.* Whenever any federal statute provides for an imposition of a civil penalty or liquidated damages or imposes a new liability or enlarges any existing liability and the statute does not specify the period within which suit to recover the penalty, liquidated damages, or any sum arising out of any new or enlarged liability may be brought, the suit, if brought in a state court, shall be commenced within one year from the date the cause of action arises or be thereafter barred.

banc process. We recently held that state statutes of limitations governing claims for breach of contract are to be borrowed for ERISA collection actions, *Ferrell,* 812 F.2d 512, and a panel of our court is not free to overrule that decision. *Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477 (9th Cir. 1987) (en banc).

In *Ferrell,* we applied an Alaska statute, holding:

> The Trustees' claim can only be characterized as a straightforward breach of contract claim. The Trustees allege that Ferrell, as a successor employer, is bound by the compliance agreement which he breached by failing to make the required contributions. Accordingly, ... we apply the Alaska limitations period governing contract actions.

*Ferrell,* 812 F.2d at 517 (footnote omitted). The Alaska statute provided a six year period within which to commence suit. *Id.* at n. 2. Similarly, the relevant Hawaii statute provides for a six year period. *See* Haw.Rev.Stat. § 657–1(1).[17]

■ Here the trustees' claim is similar to that of the trustees in *Ferrell* and the limitations period is identical. Accordingly, the Hawaii contract limitations period is applicable. We note especially that effectuation of federal policy is not impeded by application of a six year statute of limitations. Congress has expressed its clear desire "to remove jurisdictional and procedural obstacles which . . . appear to . . . hamper[ ] effective ... recovery of benefits due." S.Rep. No. 127, 93d Cong., 1st Sess. *reprinted in,* 1974 U.S.Code Cong. & Admin.News 4838, 4871. *Cf. Dice v. Akron, C. & Y. R.R.,* 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952).

Imposing too short a statute would interfere with the strong federal policy that underlies ERISA. The federal government, or more specifically the Pension Benefit Guaranty Corporation, will ultimately be liable for the payment of vested benefits if a pension plan is not adequately funded and terminates. In order to "encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants," 29 U.S.C. § 1302(a)(1), we believe that employee trust funds should be given ample opportunity to recover delinquent contributions. We need not decide here what period of time would be insufficient to protect federal interests since a six year period clearly is adequate.

The Funds' actions to collect delinquent contributions are timely under the Hawaii limitations period we borrow here.

## V. *Conclusion*

We hold that T & U was a successor employer to Waiola Carpenter Shop and was required to abide by the terms and conditions governing employment at Waiola under the 1978–81 Mill Cabinet Agreement. In addition, T & U was a member of the multiemployer bargaining association, the Wood Products Association of Hawaii, and therefore was bound to the terms of the 1981–84 Mill Cabinet Agreement. Its attempted withdrawal from the bargaining unit was ineffective. Moreover, because the applicable statute of limitations is six years, the Funds' actions are timely.

We reverse the district court's grant of summary judgment in favor of T & U and remand for further proceedings. T & U shall not be permitted to assert as a defense to the Trust Funds' actions any matter inconsistent with our above holdings. If the funds prevail below, the district court should award attorney's fees, including an appropriate amount for this appeal. 29 U.S.C. § 1132(g)(2).

REVERSED AND REMANDED

---

17. Hawaii Revised Statutes, section 657–1(1) provides:

> *Six years.* The following actions shall be commenced within six years next after the cause of action accrued, and not after:

(1) Actions or the recovery of any debt founded upon any contract, obligation, or liability, excepting such as are brought upon the judgment or decree of a court ...